**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA | : |
| | :     Crim. No. 3:92CR68 |
| v. | : |
| | : |
| JAMES H. ROANE, JR. | : |
| | : |

**APPENDIX VOL. V**

**App. 0465-0589**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

        v.                              CRIMINAL ACTION
                                        3:92CR68

JAMES H. ROANE, JR.

                              Defendant.

----------------------------------------

                EVIDENTIARY HEARING

                June 21, 2002
                Richmond, Virginia
                9:00 a.m.


BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   G. WINGATE GRANT, ESQ.
               PAUL J. ERICKSON, ESQ.
               Office of the U.S. Attorney
               Main Street Centre
               Richmond, Virginia   23219
                        Counsel for Respondent;

               PAUL ENZINNA, ESQ.
               MICHAEL BARTA, ESQ.
               Baker Botts LLP
               1299 Pennsylvania Avenue, N.W.
               Washington, D.C.   20004
                        Counsel for Petitioner.

               JEFFREY B. KULL
               OFFICIAL COURT REPORTER

2

P-R-O-C-E-E-D-I-N-G-S

THE CLERK: Case Number 3:92CR68: United States of America versus James H. Roane, Jr. Mr. G. Wingate Grant, Mr. Robert J. Erickson represent the government. Mr. Paul Enzinna and Mr. Michael Barta represent the Petitioner. Are counsel ready to proceed?

MR. GRANT: The government is ready, Your Honor.

MR. ENZINNA: Petitioner is ready, Your Honor.

THE COURT: All right. The Court has previously indicated the need for an evidentiary hearing on particular points. Is the Petitioner ready to proceed?

MR. ENZINNA: Yes, sir, we are.

THE COURT: Go ahead.

MR. ENZINNA: Your Honor, we call David Baugh to the stand, please.

MR. GRANT: Judge, I would move to exclude any witnesses who are going to testify other than one representative.

THE COURT: All right. All those in the courtroom who anticipate being called as a witness in this matter will have to leave to await their call.

THE MARSHAL:   Mr. Baugh is not answering the call.

THE COURT:   Have you seen him yet this morning?

MR. ENZINNA:   Actually, I have not seen him yet this morning.   I met with him the other day.

THE MARSHAL:   He is not out on the street, either.

MR. ENZINNA:   Your Honor, I am told Mr. Baugh is not here, nor is Ms. Reavis, who is next.   I do have a witness I can put on in the interim which is Mr. Brown, Alfred Brown.

ALFRED BROWN,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q    Good morning, Mr. Brown.

A    Good morning.

Q    Would you state your name for the record?

A    Alfred C. Brown.

Q    And how are you employed, Mr. Brown?

A    I'm a private investigator in Richmond, Virginia.

Q    Have you been employed on behalf of James Roane as

a private investigator for some time?

A    Yes, I have.

Q    When did you first become so employed?

A    It was sometime in maybe mid-1995, 1996.

Q    Did there come a point during the period in which you were working for Mr. Roane -- are you still working as an investigator for Mr. Roane?

A    Yes, I am.

Q    Did there come a point during that time when you were asked to obtain some records from a hotel in Richmond?

A    Yes, I was.

Q    Would you tell me what you were asked to do?

A    I was asked to go to the hotel to see if I could locate any records involving check-in times on behalf of Mr. Roane or his associate.

Q    Which hotel?

A    The Holiday Inn located on the Boulevard, I believe.

Q    And you say check-in times.  Were you asked to find records for any particular period of time?

A    The period of time was, I think, January 12th. Yes, January 12th.

Q    Of what year?

A    1992.

Q    Did you go to the hotel?

A    Yes, I did.

Q    And what happened?

A    I was instructed that there may be some records in a file room that I possibly could go through to see if I could locate those records.

Q    Who instructed you?

A    There was a manager there.  Tracy Campbell, I believe was her name.

Q    And when you arrived at the hotel, did he make available some records?

A    Yes, he did.  He showed me a room on one of the floors that was basically stocked with old file records.

Q    And what did he tell you?

A    Well, he gave me permission to go through it to see if I could find the records.

Q    And what did you do?

A    I went through the boxes and I did locate some names that were familiar.

Q    Were the boxes arranged by dates?

A    Yes, they were.  He had pointed me to several boxes that may involve the January, 1992 records.

Q    And you did what?

A    I actually went through each check-in card to

identify Mr. Roane's name or any names associated with Mr. Roane.

Q    What were the names you were looking for?

A    Linwood Chiles.  Because I had previous information that Mr. Chiles, you know, typically drove Mr. Roane --

Q    All right.

A    -- various places.  And I did find two cards that had Linwood Chiles.  One had Linwood Chiles, one had Larry Chiles, but both had Linwood Chiles's address, which was, I think, 1016 Clay Street.

Q    Did you look for any other names besides Linwood Chiles?

A    There were some other names associated with the case that I also pulled those cards as well.

Q    And when you pulled those records that had the names you were looking for, what did you do with those records?

A    I forwarded the records to you.

Q    Did you ask for the hotel to make copies of them?

A    I can't recall if I asked them to make copies. Either they made copies or I made copies.

Q    Did they let you have the originals?

A    Yes.

Q    I'd like to hand you what has been marked

Petitioner's Exhibit 3.

    (Document proffered to witness.)

    Let me ask you if you have seen that document before.

A    I don't recall seeing the actual letter.

Q    The cover letter, the first page?

A    The cover letter.

Q    What about the second, third, and fourth pages?

A    Yes, I did.  This is a copy of the card that I retrieved.

Q    That's the first page?

A    Yes.

Q    The second page?

A    Yes.

Q    What about the third page?

A    Yes.  I recall seeing that.

Q    And what about the fourth page?

A    Yes.

Q    Now, I note that these records are stamped Howard Johnsons, not Holiday Inn.  Can you explain that?

A    To my knowledge, at the time in 1992 the hotel was called the Howard Johnsons.  And there was a management change, so when I went there to retrieve records, it was called the Holiday Inn.

Q    Now, the first record appears to be in the name of

Larry Chiles; do you see that?

A    Yes.

Q    Why did you pull out this record?

A    Because the last name matched, and the address matched.

Q    The address, 1016 West Clay?

A    Yes.

Q    That matches the address on the fourth page of this exhibit, too, correct?

A    Yes, it does.

Q    And the fourth page of this exhibit is a record with the name of Linwood Chiles; is that correct?

A    Yes.

Q    Now, what is the date on the fourth page?

A    2 January, 1992.

Q    That's the in date, correct?

A    Yes.

Q    And the out date is January 3rd?

A    3 January, 1992.

Q    And what is the in date on the record that is the second page of this exhibit?

A    The in date appears to be -- it is pretty difficult to tell.  It is a copy.

Q    I'm sorry, what did you say?

A    From this copy, it is difficult to tell.  But from

recalling my memo to you, I believe it is January 12th.

Q    Well, look at the third page of the record.  Do you see it has a room number on the left-hand corner, 313?

A    Yes.

Q    That's the same room number, isn't it, as on the second page?

A    That's correct.  Well, yes.

Q    Let me, if I can  --

MR. ENZINNA:  Your Honor, I do have the original second page of that document which does have a date on it.  I'd like to show it to Mr. Brown to refresh his recollection.

THE COURT:  All right.

(Document proffered to witness.)

A    The date is 1-13-92.

Q    And that's the date for the second page of the records?

A    Yes.

(Document proffered to counsel.)

Q    Now, Mr. Brown, when you were asked to obtain these records from the hotel, did you experience any difficulty in obtaining them?

A    Initially, if I recall correctly, there may have

been some conversation back and forth whether a subpoena would be needed or not.

Q    All right.  But do you recall whether a subpoena was ultimately issued?

A    I don't recall.

Q    But there was no indication, or was there any indication from the hotel that the records were missing or lost or not available?

A    No.

Q    And when exactly was it that you obtained these records?

A    I think it was in the month of May of 1996 or 1998.  I'm not sure.  I would have to refer to my memo.

Q    All right.

MR. ENZINNA:  Your Honor, I would move the admission of Exhibit 3, and I have no further questions.

THE COURT:  It will be admitted.  Cross?

CROSS-EXAMINATION

BY MR. GRANT:

Q    Mr. Brown, how long did you spend at the hotel looking for the records?

A    I would say three hours.

Q    Did you find any records with the names James

Roane or Sandra Reavis on the records?

A    I don't recall, no.

Q    Is the answer no, you didn't find any?

A    The answer is no.

Q    Look at the third page of the exhibits you have in front of you, the one that has the invoice number at the top, 557538.  Look over on the left-hand side under number of persons checked into that room; is that what persons refers to as you understand it?

A    On the left-hand side?

Q    Top left-hand side below where Room 313 is written.

A    This copy doesn't have anything below.

Q    I think we are looking at different pages here.

A    Oh.  The second.  On that page, yes.

Q    How many persons are listed as being on this record?

A    According to the copy here, it appears to be one.

        MR. GRANT:  That's all I have, Judge.

        THE COURT:  All right.  Anything else based on that?

        MR. ENZINNA:  No, sir.

        THE COURT:  Thank you, sir.  You may stand down.

        (Witness stood aside.)

MR. GRANT: Judge, I didn't state earlier, I might have an objection to relevancy unless Mr. Enzinna can tie this up. But I assume he is going to try to do that. At this point I see no relevancy to the issue before the Court, so I would note an objection at this point, but obviously giving him an opportunity to show that.

THE COURT: Why isn't Ms. Reavis here?

MR. ENZINNA: I don't know. I just don't know.

THE MARSHAL: She is here.

THE COURT: Yes. She was to be brought in by the Marshals.

THE MARSHAL: She is here.

MR. ENZINNA: We call Ms. Reavis.

THE COURT: Okay.

SANDRA REAVIS,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BARTA:

Q    Good morning, Ms. Reavis. Could you please identify yourself for the record?

A    Sandra Reavis.

13

Q      That's R-E-A-V-I-S; is that correct?

A      Yes.

Q      Just to cut right to the point, you were a defendant along with Mr. Roane in the trial that led to his conviction; is that correct?

A      Yes.

Q      And were you yourself convicted and are now serving time; is that correct?

A      Yes.

Q      Very briefly, when did you meet James Roane?

A      In November.

            THE COURT:    You are going to have to speak louder.  I can't hear you.

            THE WITNESS:    In November of 1992.

BY MR. BARTA:

Q      Okay.  And where did you meet him?

A      In the area of Clay Street.

Q      About how long did you know him in that area of Clay Street?

A      Not real long.

Q      Couple months?

A      Yes.

Q      And just in general, what was the nature of your relationship with Mr. Roane?

A      We had a relationship.

Q    When you say a relationship?

A    We were friends at first.

Q    Friends at first, and then a romantic relationship?

A    Yes.

Q    Directing your attention to the evening of January 12th, 1992, do you recall that evening, the evening of the Doug Moody murder?

A    Somewhat.    From what they say.

Q    Okay.    Let me ask you that:    On that night, where do you recall being, January 12th, 1992?

A    In a hotel with James Roane.

Q    Okay.    How did you and Mr. Roane get to the hotel room?

A    Moody, what's his name, Linwood Chiles and Carmella Cooley.

Q    You mentioned two names there.    The first was Linwood Chiles.

A    Linwood Chiles and Carmella Cooley.

Q    Did Linwood Chiles have an automobile?

A    A station wagon.

Q    A station wagon?

A    Yes.

Q    Do you recall what color that was?

A    It was brown and beige.

Q    Okay.  And from time to time, did he have occasion to drive Mr. Roane to your own knowledge and observations?

A    Yes.

Q    Okay.  Now, when you said that you and Mr. Roane went to the hotel with Mr. Chiles, was he in fact driving that night?  Mr. Chiles?

A    He drove the car.

Q    Okay.  And you mentioned a second name, Carmella Cooley?

A    Cooley.

Q    C-O-O-L-E-Y?

A    Yes.

Q    Okay.  Now, what hotel are we talking about?

A    The one up off of the Boulevard up there by, I think it is Days Inn right there by the Greyhound Bus Station, right around there.

Q    Right around the Boulevard?

A    Yes.

Q    Howard Johnsons, would that refresh your recollection?

A    Yes.

Q    Okay.  And approximately what time do you recall Mr. Chiles driving you and Mr. Roane and Ms. Cooley to the Howard Johnsons that you described?

A    About nine.

Q    9 o'clock in the evening?

A    Yes.   It was dark.

Q    Okay.   And when you arrived there, did you yourself get out to check in and to purchase the room?

A    No, I didn't.

Q    To your knowledge and recollection, who did?

A    I would say Carmella did.

Q    Was Mr. Chiles with her?

A    I think we were sitting in the car waiting on her.

Q    Okay.   Now, after the room was purchased, do you recall going to the room?

A    Yes.

Q    Who went to the room?

A    Me and James Roane and Chiles came in the room.

Q    Okay.   Approximately how long did Mr. Chiles stay in the room?

A    Not long.

Q    Okay.   Did you yourself stay in the room that night?

A    Yes.

Q    All night?

A    Yes.   Until the next morning, until about ten, 10:30 that morning.

Q    Did Mr. Roane stay in the room the entire night?

A    Yes, he did.

Q    Was he in your immediate presence in that room throughout the night of January 12th through to the morning of January 13th, 1992?

A    Yes, sir.

Q    Okay.  Now, you said that the next morning, about 10 or 10:30, you checked out of the room?

A    Yes.

Q    What did you and Mr. Roane do at that time?

A    We left.  Got a cab, called a cab, and left.

Q    And went where?

A    Down there to Clay Street.

Q    In this immediate vicinity with Clay and Harrison?

A    Yes.

Q    You lived right around there?

A    I lived on Harrison.

Q    When the cab pulled up, was it just you and Mr. Roane in the cab?

A    Yes.

Q    Did you learn something shortly after that cab arrived back in the Clay-Harrison Street corner?

A    Well, later I learned that Douglas Moody had been killed.

Q    We are talking about events about ten years ago. How do you remember so clearly what you were doing?

A    How I remember so clearly?  Because they gave me the murder of that boy ten years ago.

Q    So the prosecution charged you with the Douglas Moody murder?

A    Yes, I was charged with that.

Q    And has that event impacted one way or the other your recollection of what you were doing the night Doug Moody was killed?

A    I was charged with that murder by myself.

Q    Okay.  Do you recall from time to time talking to various police detectives about the Doug Moody murder and other matters?

A    Well, I was questioned about a lot of things, and when not answering, I was given the Moody charge.

Q    Do you recall telling those detectives that you had nothing to do with the Moody murder and knew nothing about it?

A    Yes.

Q    Okay.  I guess the final question is, you say that you had this relationship with Mr. Roane for a couple of months ten years ago.  Do you remain close to Mr. Roane in any way today?

A    No.

Q    Okay.    Is there anything about your relationship with Mr. Roane that would cause you to slant your testimony in this matter in one direction or the other?

A    No.

MR. BARTA:  Your Honor, if I could have one moment's indulgence?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

MR. BARTA:  Thank you, Ms. Reavis.  I have no further questions.

THE COURT:  Cross?

CROSS-EXAMINATION

BY MR. GRANT:

Q    Ms. Reavis, you were addicted to heroin in 1992, were you not?

A    Yes.

Q    And you were also using crack cocaine in 1992?

A    No.

Q    Were you seeking any treatment for your drug addiction in 1992?

A    Yes, I was going to -- I was in the drug treatment, methadone.

Q    You were interviewed by Richmond Police detectives on two occasions after the Doug Moody murder; is that

correct? Do you remember those interviews at the police department?

A    I only had one.

Q    Well, do you recall being interviewed on February 25th by Detectives Woody and Jackson?

A    Yes.

Q    And did they question you about the Doug Moody murder at that time?

A    They asked me a lot of questions at that time, and when I didn't say what they wanted me to say, that's when I was given that charge.

Q    But you were questioned, among other things, about the Doug Moody murder on that date; is that correct?

A    Yes.

Q    Did you say anything during that interview to your recollection that you were in a motel with James Roane when Doug Moody was killed? Did you make that statement or anything like that?

A    No. I don't remember that.

Q    Did you say anything about Carmela Cooley in that interview?

A    No.

Q    Did you make any statement that Linwood Chiles had driven you somewhere on the night of the Doug Moody murder during that interview?

A    Huh-uh.

Q    Do you recall an interview on April 8th, 1992 by Detective Jackson where you were asked about the murder of Peyton Maurice Johnson?

A    No.

Q    You don't recall that interview?

A    No.

Q    Did Mr. Roane communicate with you by letter after he had been arrested on these charges?

A    Yes.

Q    Let me show you a document that I am marking as Government Exhibit 1.  I have previously given it to counsel.

(Document proffered to witness.)

Do you recognize that document, Ms. Reavis?

(Witness perusing document.)

A    I don't remember this.

Q    At this point, I'm just asking do you recognize the document.

A    No.

Q    You don't recognize it?

A    No.

Q    It is addressed to Sandra; does it appear to be the handwriting of anyone you know?  Specifically, does it appear to be James Roane's handwriting?

(Witness perusing document.)

A    No.

Q    Is that a no or you don't know?  I couldn't hear your answer.

A    No.  It has been so long.

Q    Okay.

MR. GRANT:  That's all I have, Judge.

THE COURT:  All right.  Anything else based on that?

MR. BARTA:  Very brief redirect, Your Honor.

REDIRECT EXAMINATION

BY MR. BARTA:

Q    Ms. Reavis, counsel asked you a series of questions about what was said and what wasn't said in an interview with Detectives Woody and Jackson.  You do recall that interview, do you not?

A    Yes.

Q    Are you aware that a transcript was made of the interview; that they had a tape recorder there or something?

A    I don't know if something was there, but I know they took me in this back room and it was like a cell in the back, a little table where we sat at, and a microphone was sitting there.

Q    Okay.  Counsel asked you if you ever said anything

about going to a hotel the night of January 12th. Do you recall Detectives Woody and Jackson even asking you what you were doing that night?

A    No. They didn't ask me that.

Q    Okay. Did they ask you any of the other questions that counsel asked you today?

A    No.

Q    Okay. In fact, do you recall that the only questions you were asked about the Doug Moody murder were whether you in fact were present when it occurred; do you recall that was in substance the only question they asked you about?

A    He didn't ask me that.

Q    Okay.

A    Not then. He didn't ask me that. They just charged me with that when I didn't answer other questions.

Q    Okay.

MR. BARTA: That's all I have, Your Honor.

THE COURT: All right.

MR. GRANT: Could I have one quick follow-up?

THE COURT: Sure.

RECROSS-EXAMINATION

BY MR. GRANT:

Q     Ms. Reavis, when did you first tell anybody that you were in a motel with James Roane on the night that Doug Moody was killed?

A     I can't recall.

MR. GRANT:   That's all I have, Judge.

THE COURT:   All right.   Thank you.   You may stand down.

(Witness stood aside.)

THE COURT:   When is the last conversation you had with Mr. Baugh?

MR. ENZINNA:   The last conversation I had with him was Wednesday night, Your Honor, in Washington.

THE COURT:   And he was aware of the time that we were starting the hearing?

MR. ENZINNA:   And he was planning to be here.   I can put on another witness, Your Honor.

THE COURT:   Go ahead.

MR. ENZINNA:   We call James Roane.

JAMES ROANE,

the Petitioner herein, called as a witness by and on his own behalf, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q    Mr. Roane, would you state your name for the record, please?

A    James H. Roane, Jr.

Q    Mr. Roane, in 1993 you were convicted of the murder of Douglas Moody; is that correct?

A    Yes, I was.

Q    You were sentenced to death for that murder, correct?

A    Yes, I was.

Q    Was that in this courtroom?

A    In this courtroom.

Q    At the same time, you were convicted of several other murders, were you not?

A    Yes, sir.

Q    Louis Johnson?

A    Yes.

Q    Maurice Johnson?

A    Yes.

Q    Torrick Brown?

A    Yes.

Q    You received life sentences for each of those murders, didn't you?

A    Yes.

Q    You were convicted of other crimes as well, correct?

A    That's right.

Q    In addition to your death sentence, you are currently serving a sentence of life plus 65 years; is that correct?

A    That's true.

Q    Where are you serving your sentence?

A    In Terre Haute, Indiana, a death row unit.

Q    How old are you now?

A    I am 36 now.

Q    So in January of 1992 were you 26?

A    Yes, I was 26 at the time.

Q    Now, in January of 1992 had you recently been released from jail?

A    Well, in 1991 I was released. November 19th, 1991.

Q    November 19th, 1991?

A    Yes.

Q    How long had you been in jail?

A    I had been in jail about approximately 17, 18 months.

Q    And when were you arrested?

A    February the 1st or 2nd.

Q    Of 1992?

A    1992.

Q    I'm going to show you a map.

MR. ENZINNA:  If I may bring this a little bit closer?

THE COURT:  Sure.

(Document displayed to witness.)

BY MR. ENZINNA:

Q    I don't know if you can see this any better.  Can you see that?

A    Yes, I can see it.

Q    You can see here is Leigh Street, Catherine Street, Clay Street, and the north/south streets are Norton, Harrison, Hancock, Goshen, Gilmer, and Mumford; is that correct?

A    I see Gilmer, Goshen, Hancock, Harrison.  Yes, I can see them.  And Catherine.

Q    Where were you living in January of 1992?

A    In January of 1992 I was living in the yellow house on the corner of Norton and Catherine.

Q    That would be right about here?

A    Yes.  On the corner.

Q    I'm going to put a Number 1 right there.  Whose house was that?

A    It was my dad's house, and I was renting the upstairs of the house.  But we had some other people living downstairs.  A couple was living downstairs in the house.  I was living upstairs.  I was renting the

upstairs of the house.

Q    Okay.  You mentioned other people.  Was Denise Berkeley living in the house?

A    I let Denise Berkeley stay there for a while because Jeanette Pauley had put her out and she had nowhere to go.  And being that I didn't stay home a lot, I was basically in and out a lot and I was gone a lot, staying over at this girl's house or that girl's house.  I let her stay there on the condition that she would clean the house for me or, when I was there, when I had company, get her to go to the store and, you know, I would give her money for going to the store and for cleaning up the house.

Q    Who was Denise Berkeley?

A    I met Denise Berkeley on the corner of Hancock and Clay.  It was about -- it was a corner where numerous drug dealers stood on that corner and sold drugs.  And I was talking to Jeanette Pauley one day because I knew her, you know; I had been knowing her for years.  And Denise was standing behind me.  And she asked me could she run customers to me.  And what that means is, she know addicts that she would send that addict to me to buy, you know, crack cocaine.  And I told her "Yes, that would be cool."  She asked me would I look out for her, meaning would I give her some for doing that.

Q    Now, you said that you offered to let her live in your house so she could clean the house.

A    Yes.

Q    How long did that arrangement last?

A    It didn't last probably about -- I would say not even a month.  Because it got to the point where my parole officer, at that time I was getting permission from my parole officer to go out of town.  I had a girlfriend in Martinsville, Virginia.  And my parole officer would grant me time to go down there and I would stay.  But when I would come back, you know, the house don't be cleaned up or Denise, she will have girls over there because she was into women.  She would have women over there and wouldn't clean the house up.  So I got kind of pissed off at that.  So I asked for the key back at that time.

Q    Did there come a time when you got angry at her for smoking crack in the house?

A    Yes.  There was a time where Cory Johnson, one of my co-defendants in the trial, had a key.  And he gave Denise the key one day.  And I was in Martinsville and I had just came back from Martinsville and her and Mousey was sitting in the middle of the floor smoking crack on the floor.  And I got pissed off and asked them who let them in.  They said, "Oh, Cory," which was

Cory Johnson, gave them the key.  I told them that they had to leave because, you know, I didn't want that in my dad's house, you know.  If the police or whatever came in, then that would have been on my dad.  And I didn't try to keep drugs or guns or anything else in my dad's house.

Q    When did that occur in relation to when you were arrested?

A.    Probably about maybe two weeks or three weeks before I got arrested.

Q    Now, did you know Pepsi Greene, Priscilla Greene?

A    Yes, I did.

Q    Who was Pepsi Greene?

A    Pepsi, I met Pepsi one day when I first went out there.  Me and Cory Johnson first went out there to Hancock Street.  And this particular day, it was Petey Sue out there, who was Jeanette Pauley, and Priscilla Greene.  And we were sitting on Hancock Street at this abandoned house and it had a porch.  And I asked her, you know, did she get high?  She said, "Yeah."  And I gave her some crack cocaine to test for me, and she came back and said it was good.  And I asked her did a whole lot of traffic come through there, meaning do a whole lot of customers come through?  And she at that time said, "Yeah," and that's how I met her.

Q    You talked a lot about selling drugs. Was that how you supported yourself in January of 1992?

A    Yes, I did.

Q    Were you running with Richard Tipton at that time?

A    Yes. He was a friend of mine.

Q    And Cory Johnson?

A    He was a friend.

Q    And was Pepsi Greene involved in selling drugs?

A    Pepsi Greene was selling drugs. She was selling drugs for numerous people at that time. Whoever would give her some, she would work for. And I remember one time Richard Tipton came up there and he asked, he asked me could I, you know, set him up in a place up there. And I told him I would talk to Linwood. So he stayed there for one day selling out of their house.

Q    Whose house?

A    Out of -- it was Curt Thorne and Pepsi Greene. Priscilla Greene. And at that time, me and Sandra was walking around the block and we was about at Harrison and Catherine. And Curt Thorne, who used to work with me, you know, prior to then, him and Pepsi came up to me and they were pissed off. And I asked them what was wrong. And they said that they hadn't ate all day and they didn't have kerosene and their house was cold.

And so I said, "Well, wasn't Tip at your house?"  They said, "Yeah, but he didn't give us anything.  So we asked him to leave."

So I gave them some money to get something to eat so they could get some hot dogs or something, and they were like "You going to give us some money for him selling out of our house?"  I said, "No, I'm not going to give you nothing because I had nothing to do with that.  That was only you and him."  And, you know, they got -- they were kind of pissed off about that.

Q    When did that occur?

A    That happened in like November.  That was in November or maybe early December of 1991.

Q    So shortly after you got out of jail?

A    Shortly after I got out of jail.

Q    All right.  Let's talk about Douglas Moody.

A    Okay.

Q    Did you know Douglas Moody?

A    Yes.  I met him on Hancock.

Q    Who was Douglas Moody?

A    Douglas Moody, really, that was my first time meeting him.  There was a Chinese store on the corner of Hancock and Clay, like I said, where most of the drug dealers sold drugs up in that neighborhood.  And Moody used to stand out there and he used to run

customers for different drug dealers that was out there. And we just would make small talk and I would give him some, or if I went in the store and bought something, I would buy a lot of spiced shrimp, and we would set out there and I would buy beer and we would drink beer and eat spiced shrimp. And/or I would send him to the Burger King or something and give him crack. I would pay him crack for doing that. Or if he came up to me and said, "Look, I haven't had a hit all day and I want a hit," I would give him a hit.

Q    Was Douglas Moody a drug dealer?

A    Not that I knew of. I never knew him to be a drug dealer. And most of the people that I knew up in that neighborhood knew him as smoking crack. He was an addict, but he never was a drug dealer that I knew of.

Q    Now, you said that you supported yourself at that time by selling drugs.

A    Yes.

Q    Were there rival drug dealers in the area?

A    Not, you know, at the time that I was up there. There wasn't no rivalry. Everybody from Gilmer Street had their drug dealers on Gilmer. You had your drug dealers on Hancock. On Norton Street you had Maurice and Rochelle. I used to sell out of the yellow house on Norton Street. I had one side, Maurice and Rochelle

had the other side.  And we had this thing where if customers came on their side, I wouldn't bother them. If customers came on my side, they wouldn't bother them.  And we would sit out there and eat pizza together.  And Rochelle had a cordless phone at the time, and I used to get a lot of pages from girls.  She would let me use her phone and we would all sit out there.  We was all friends.

Q    Did you compete with Douglas Moody to sell drugs?

A    Never.  I never known him to sell drugs.  I've always gave him crack because he didn't have none or he wanted to go to the store or something for me and I would just look out for him.

Q    Did there come a time when Douglas Moody gave you an audio tape?

A    Yes, he did.

Q    What happened?

A    I was walking up the street going to Norton Street, me and Sandra Reavis, and we was in the alley at Catherine, and I heard somebody in the bushes like "Psst, psst."  I was like "Who is that?"  He said, "Little Doug."  He said, "I got something for you."  I was like "I don't want to buy nothing."  Because when you are a drug dealer you get a lot of people trying to sell you things.  I said, "I don't want to buy nothing,

Doug." He said, "No, J.R., I have got something for you. I want you to listen to this." I said, "What you want me to listen to this for?" And he gave me a tape. And I said, "Well, okay, what is it? What do you want for this?" You know. He said, "I don't want nothing. Just go listen to this." And I said okay.

And I took the tape to Norton Street and I put the tape in a tape deck. And on the tape, you had Renita Holman, which is Rochelle, you had Maurice Johnson, and you had another guy named K.K., and I heard about two or three other voices on there.

Q    What were they talking about?

A    What they were talking about first, because I confronted Maurice. This friend of mine, his mother died when we was younger and my mother kind of like raised him. I let him stay in Peaches' house where I used to sell drugs out of that house. And he, Jeffrey, was a crackhead. He was an addict. But he was like a brother because my mother raised him. I was going to Martinsville that weekend and I told Jeff, "Don't get anything from nobody out there." So when I got back from Martinsville, everybody was telling me, Denise and all of them was telling me that Maurice was looking for Jeffrey to do something to him. So I confronted Maurice in front of Rochelle. And he had a few workers

out there on Harrison -- on Norton Street.  I asked him, I said, "Well, what do Jeff owe you?"  He said, "It wasn't nothing but a hundred dollars."  I said, "Let me pay you that because I don't want no beef between you and me if you do something to him."  He said, "No, no, no problem, no problem, it is cool."  And I got the feeling at that time that he didn't like the way I confronted him in front of his girlfriend, Rochelle, and his workers.  So that week I noticed that --

Q    When was this confrontation?

A    This happened in December.  It happened in late December, early January.  And so on the tape, it had Rochelle talking about "Yeah, James Roane confronted Maurice.  And you know, we got Uzis.  And, you know, they ain't going to be selling no drugs up here." And they went on to say that, you know, a few other guys that was working on Hancock, a couple of guys on Gilmer, and how they were going to take over the neighborhood and what they were going to do.  And I'm sitting there thinking, because I remember Maurice had an Uzi, was buying Uzis, and Rochelle was running around with shotguns.  And I'm like at that time, I didn't have a weapon at all.  So after I listened to the tape, I went back outside and I had about close to

a half an ounce of coke. And I asked Doug, I said, "I want to pay you for doing this."

Q    Why did you want to pay him for doing that?

A    Because if somebody -- if you heard somebody talking about plotting against you or plotting to take your life and somebody gave you a tape, it was like he was doing me a favor. So I felt like at that time I wanted to do him a favor. And I offered him some coke. He said, though, "J.R., I'm doing this because you done looked out for me so many times."

Q    When did he give you the tape in relation to when he was killed?

A    Probably I think a day. It was like two days, maybe three days. I'm not sure. Because after that, when I listened to the tape that night, Tipton had went home to see his grandmother. Johnson was at some girl's house. And so I let them listen to it like the next day, I think, or the following day after that. And after I let them listen to it, a guy named Mike listened to it who used to work on Hancock and Clay. And I gave it to a friend of my dad's and told him to hold it because if anything happened to me, I wanted him to have that tape.

Q    Now, was Douglas Moody on the tape?

A    Douglas Moody was not on the tape.

Q    Was Little Keith on the tape?

A    Little Keith was not on the tape.

Q    Did Little Keith work for Maurice Johnson?

A    Little Keith worked for a guy named Bill.  He didn't work for Maurice that I know of.

Q    All right.  Did there come a time when you learned that Douglas Moody had been killed?

A    Yes.

Q    When did you learn that?

A    I learned that after I came from the motel, sometime that evening.  I think, if I can recall, I went over to Peaches' house to sell out of her house and she told me about it.  And when she told me about it, I was really upset about it.  Because Doug, like I said, you know, did me that favor and he was just a good person.  I ain't never seen him do anything wrong to nobody other than just, you know, being an addict.

Q    So you found out about it the day after Moody had been killed, right?

A    Yes.

Q    I want to talk about the day before you found out, which is the day on which Moody was killed.

A    The day he was killed?

Q    Yes.

A    Okay.

Q    You said that you found out when you returned from the motel.

A    Yes.

Q    I want to talk about the day you went to the motel.

A    Okay.

Q    What did you do that day?

A    I had been up in Peaches' house.

Q    Who is Peaches?

A    Peaches was a girl that lived in a yellow house on Harrison Street. And her and her boyfriend, her and Ronnie, I used to sell out of their house. But they were addicts. And being that I was an ex-addict, I wouldn't give them anything. I would stay in their house and let them run me customers. And that way, I felt like at that time, if the police came, I could throw the drugs in their house because the house was not in my name. And I didn't have to worry about chasing them down because I didn't put anything in their hands. They were running the people to me.

So I was working out of their house all that night. And in the wee hours of the morning, two girls came over and I had sex with them, and --

Q    When did you leave Peaches' house?

A    Probably about -- I would say about 11:30, maybe

12 noon, because I took a bath over there. Because I remember the hot water was messing up in the yellow house that I had on Norton Street, so I took a bath there. And I told Peaches if anybody came around there looking for me, you know, just tell them I was gone. And I went in the house. And I was exhausted because I had been up all night. I had been ripping and running, just had sex with a couple of females. So I went in the house and I went to sleep. When I woke up, it was dark outside.

Q    James, wait. You said that you went home about 11:30 or 12?

A    Yes.

Q    And then went to sleep?

A    Yes. I went to sleep.

Q    And then you woke up and it was dark?

A    Yes.

Q    What did you do then?

A    What did I do then?

Q    Yes.

A    Okay. When I got up, I grabbed a couple of hundred dollars, I washed my face, I walked down Catherine Street. And when I got to the corner of Catherine and Harrison, I whistled up to Sandra's house and called her and she came on the porch, on the

balcony. And I told her, I said, "I be back to get you."

Q    Where did Sandra live?

A    She lived --

Q    On Harrison Street?

A    Yes, on Harrison Street.

Q    Right here?

(Counsel indicating.)

A    She lived there.

Q    We will mark that with a 2. Then you said you whistled up to her from the corner of Catherine and Harrison?

A    Yes, because they had a balcony with a porch.

Q    On the corner of Catherine and Harrison is right here?

(Counsel indicating.)

A    Yes.

Q    I'll mark that with a 3. Tell me about Sandra. What was your relationship with Sandra?

A    Well, we was friends. We started out as friends. Because, you know, I used to be an IV drug user years ago, and so was she. And we knew each other. We wasn't friends but we knew each other. And by me just getting out of prison and she evidently had not too long got out of prison and was on methadone at that

time. And we used to sit and talk about things that we used to do in terms of being addicts and stuff like that, so we developed a relationship like that and then it got sexual.

Q    So when you yelled up to her, you were yelling up to her to come down and meet you to do what?

A    Yes, to go to the motel. Because me and her went to the motel a lot, a whole lot. Either Linwood took us or she would get Carmela's ID and use her ID. And we would go to the Howard Johnsons at that time.

Q    We will come back to that. Why is it that you yelled up in the corner rather than go ring her doorbell?

A    Because Sandra was living with a guy named Jimmy, and that was Carmela's cousin. They were living in this house together. And at that time, when we started getting intimate, I used to go to the house a lot. He would take me to go get my haircut or go see my parole officer, and it got to the point where people was saying, was telling me that I needed to stop doing that to that guy, Jimmy, because he was a hard-working guy and he was going with Sandra. "Don't do it in his house or don't do it in his face." People was telling me that. So that's why I didn't go to the house.

Q    So you called up to her from the corner there?

A    Yes.

Q    Then what did you do?

A    I told her that I be back to pick her up in about five minutes. And I walked down Catherine Street to almost down to the middle of Gilmer.

Q    Here?

A    Yes.

Q    What was there?

A    It was a guy named Ty-Bee that lived there.

Q    I'll mark that with a 4.

A    A Jamaican guy that I used to buy weed from. Marijuana. I bought marijuana from him a lot. And I went down there and I got about anywhere from a half an ounce to an ounce. I'm not sure. And once I got that, I walked back up to the corner and I whistled. Sandra came out.

Q    When you say "the corner," which corner? Do you mean --

A    The corner of Harrison and Catherine.

Q    Same corner? Okay, we will put a 5 there. All right. And what happened then?

A    I whistled for Sandra. She came out. And we started walking on Catherine and we got in like between the middle of the block of Catherine, and I was like "You got your ID?" And she was like "No, I left it in

the house." She was fumbling around. She said, "No, I ain't got it. I left it in the house." She was getting ready to turn around and go back, and I said no. Because she was like "Jimmy going to say something. I don't want to hear his mouth. I know you don't want to hear his mouth. Let's get Linwood. He can give us a ride and get the room."

Q   Where did he live?

A   Linwood lived on Clay Street. What we did was, we walked down Catherine, made that right on Hancock, and then made that left on Catherine, and --

Q   You said you made a left on Catherine. Do you mean Clay Street?

A   I mean Clay Street. And when we got there, Linwood lived in like the second or third house in from the corner. And when I knocked on the door --

Q   Linwood lived right about here?

    (Counsel indicating.)

A   Yes. He lived in like the second or third house from the corner on Clay Street.

Q   I'll put a 6 there. Okay. You went to Linwood's house. What happened there?

A   I knocked on the door and he came to the door. He was eating food because he had food all over his mouth. And I said, "I need you to take me to the

motel." And he said, "Well, I'm eating with my family right now. Give me a few minutes." And I said, "Okay." So Sandra -- Carmela lived next door to Linwood in a rooming house.

Q    Directly next door?

A    Directly next door. It was a rooming house. And Carmella lived upstairs. And downstairs, this girl named Amy lived downstairs. And at that time, Tipton, you know, had some type of relationship with her. I don't know what you call it, but they had a relationship. Anyway, when I got -- Sandra went upstairs and I went to Amy's house to use the phone. So when I got in there, Little Willie was in there. That's Sandra's son, Eric. He was about 16. He was in there, and this girl Amy, whose place it was. And so I said to them, I said, "I heard you all was trying to learn how to roll blunts," which is marijuana in tobacco paper. And they started laughing and I started rolling up a blunt. And I smoked the blunt and I got on the phone and made a couple of phone calls to some girls, and we just sat in there and laughed for a minute. And then Sandra -- Carmella came downstairs.

Q    Let me stop you for a second. We are talking about Carmella. Did you know Carmella well at the time?

A    I just knew her from being around Sandra.  She was pregnant at the time and I really didn't like -- I used to get on Sandra a lot because Sandra used to give her money and take care of her and she used to always tell Sandra to ask me for crack cocaine.  And I didn't want to do that because she was pregnant.

Q    Was Carmella a drug user?

A    Yes, she was using drugs.

Q    How else was she related to Sandra?

A    That was Jimmy's cousin.

Q    Jimmy's cousin?

A    Yes.  She was Jimmy's cousin.

Q    Jimmy was the man who Sandra lived with?

A    Yes.  That was Sandra's boyfriend.

Q    You said Carmella and Sandra came downstairs?

A    They came downstairs and we went on the front porch.  And we waited about maybe three or four minutes.  Linwood came down, and we got in the car.  We went -- we stopped on the Belvidere Boulevard, it was like a gas station-convenience store.  We stopped at this gas station-convenience store and I got a couple papaya juices and some sweets because I was smoking weed that night.  I got some sweets.  So when we got to the motel, what I remember is, Linwood had a station wagon.  We was in the station wagon.  Me and Sandra was

in the back seat. Linwood was driving. Carmella was in the passenger's seat. What I remember that day is they got out and they got the room. I gave them the money. I gave Linwood the money. I think I gave him maybe $60, $70. I think it was $70, something like that. He went and got the room. They both went in and they came back. And he said, "It is all the way in the back." We drove around the back. We went in the room. I gave Linwood Chiles at that time a piece of coke; and I said, "Don't think I forgot about my change from the room." And he started laughing and said, "J.R., you don't forget nothing." And they left.

Q    Now, Linwood Chiles; who was Linwood Chiles?

A    Linwood Chiles, I had been knowing Linwood Chiles for years because his uncle went with my aunt, my dad's sister, for years. So I knew Linwood for years.

Q    Okay. And what did Linwood Chiles do? Did you frequently get rides with him?

A    Everybody, all the drug dealers in that neighborhood, in that whole neighborhood, Linwood was like a cab to everybody. Not just to me, but everybody. And he gave people rides. And they paid him either in coke or money. He was just like a cab to everybody.

Q    I'd like to hand to you what's been marked as

Petitioner's Exhibit 3 and ask you to turn to the last page of it.

(Document proffered to witness.)

The record from the Howard Johnsons.

A    Yes.

Q    The hotel at the time, was it a Howard Johnsons?

A    Yes, it was a Howard Johnsons.

Q    Do you see on the second line the address, 1016 West Clay Street?  Is that Linwood Chiles's address?

A    If I can recall, yes.

Q    Flip back two pages to the second page of this document.  Do you see there is a record that says "Larry Chiles," but it has the same address on it?

A    Yes.

Q    Is that Linwood Chiles's address, 1016 West Clay?

A    Yes.

Q    And these are records for two different days.  Did Linwood get you hotel rooms on more than one occasion?

A    Yes, Linwood got me motels all the time.  Not only that, but Linwood would take me -- at that time I was seeing a lot of females in different parts of town in the City of Richmond, and Linwood would always take me there.  He even took me to Martinsville.  So Linwood did take me around a lot.

Q    Let's go back to when you were in the hotel room.

You said that Linwood and Carmella came up to the room with you and Sandra?

A    Yes.

Q    They stayed for a while?

A    They stayed about maybe three or four minutes.

Q    And then you gave Linwood some coke?

A    I gave him some coke.

Q    And they left?

A    And he said to me -- I said, "I didn't forget my change." He said, "I know. You don't forget nothing, J.R." We laughed and he went on out the room.

Q    What happened then?

A    That night, me and Sandra talked, had sex, went to sleep. And they called, I think, for check-out. And I told them to call us a cab because whenever I stayed at the motel, I always would tell them to get me a cab. And the cab came and we went. If I can recall, we either stopped at my house or Sandra's house, which was on Harrison Street, or either Catherine Street, and we got out of the cab and I left. She went in the house and I went on about my business.

Q    And then that's when you found out about Douglas Moody's murder?

A    Yes. I think when I went to Peaches' house, if I can recall.

Q    Now, after you were arrested, there came a point when you were charged with the murder of Douglas Moody, right?

A    Yes.

Q    David Baugh was appointed to represent you, correct?

A    Yes.

Q    Did you talk with David Baugh about the murder of Douglas Moody?

A    Yes.  I told David --

Q    Did you tell him what you have just told us?

A    Yes.  I told David what I told the Court.  And I basically told David, you know, what I am telling the Court.  And what I told David then is, "You know, I know I did some things wrong in my life, and especially back during that time.  And I have hurt a lot of people.  I have hurt my family.  And even victims.  And I take responsibility for that.  But I did not kill Douglas Moody."  And I told David that.  I told David I was in a hotel.  And I told David at trial, "Remember?" I asked David, because he was telling me that Moody's mother, after talking to Detective Dalton, said two other guys kicked in her house with Uzis looking for her son before he came and told her that her son was dead.

And I asked David why didn't he subpoena the mother. And at that time, I don't remember what he said. And I asked him why didn't he subpoena Carmella? Because, he said, he went and talked to her, but she didn't want to get involved. She confirmed everything that I had said, but she didn't want to get involved because of the publicity of the case. And I said, "You should have subpoenaed her regardless." And, you know, at that time David was like "I don't think they got enough evidence to convict you on this." And at that time I was like I didn't know; I had no knowledge of the law at all. And I knew that this weren't right. We needed to have them people there.

Q.     Did Mr. Baugh tell you whether or not Carmella -- you said he told you he had met with her?

A     He told me he went and met with Carmella.

Q     Did he tell you whether or not she had confirmed your alibi?

A     Yes. He said he went there and she confirmed everything that happened from the time frame to going to the motel, you know, everything I've told the Court.

Q     And did you discuss with him whether or not he should subpoena her?

A    Yes.  I told him that he should subpoena her.  And he was like she didn't want to get involved because of the publicity of it, and that was it.

MR. ENZINNA:  May I have a moment, Your Honor?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

MR. ENZINNA:  Your Honor, I have nothing further.

THE COURT:  All right.  Cross?

CROSS-EXAMINATION

BY MR. GRANT:

Q    Mr. Roane, how many times had you stayed at that Howard Johnsons Motel on the Boulevard prior to -- well, in your entire life?  How many times have you stayed there?

A    Stayed there?  Probably about, if I can recall correctly, probably -- I know it was more than ten times.

Q    And was that before or after Doug Moody was killed on January 13th, 1992?

A    I can't recall if I went there after Moody's murder.  I know that I went there a lot.  From the time that I was released from the Department of Corrections, my first weekend home I stayed there.  As a matter of

fact, my girlfriend from Martinsville came that weekend and we stayed there.  And I went there almost every weekend, I think, from that time on up to probably a couple weeks before I got locked up.

Q    And were you with Sandra Reavis on more than one occasion at the motel?

A    Yes.

Q    How many times was Sandra with you at the motel?

A    I mean, I can't recall all the times, but we went there a lot.

Q    And whose name did you register under when you went to the motel?

A    It was either Linwood Chiles or Carmela's name, or a friend of my dad's, I would get him to get the room. Just different people.  I would always do that.  It depends on if I am getting a ride from somebody and I know that they got ID, because I didn't -- most drug dealers don't ride around with ID's on them.  I didn't ride around with an ID on me.  If I got a ride from somebody and I paid them, you know, $20 or $30 to take me five minutes to a hotel, then I would ask them to get a room.  It didn't matter who was it.  I mean, at that time, I didn't care who it was as long as I got the room.

Q    Well, do you remember any other names that you

might have used when you registered or someone registered for you to get that room other than Linwood Chiles?

A    No.    Because I never went in.

Q    What are the names of the people who took you to the motel?  You say they registered under their own names.  What are their names?

A    Yeah, Earl Grainger got rooms for me more than a dozen times.  And Linwood.  Like I said, Sandra.  Wild Man, I don't know his real name, he got rooms for me before.

Q    His last name is Stephens; is that correct?

A    I don't know his last name.  But he got a room for me a time or two.  I can't recall, you know, all the names.  I mean, that was ten years ago.

Q    Did you give those names to your lawyer or to the investigator who was working for you before he went to the motel to search for records that might have pertained to when you were there?

A    I told David Baugh that Linwood Chiles and Carmella went in to get the room.  I told David Baugh that me and Sandra were together, and I told him what I told the Court.  And David Baugh told me that the hotel had sold out; that it was no longer the Howard Johnsons, it is the Holiday Inn.  And he said that they

didn't have the records. And he was saying it like he didn't believe me and I said, "I know where I was at." I said, "It was at the Howard Johnsons." I told him who got the room. And they went in and he was like "They didn't have no records." That's what he told me. Now, I wasn't out in the street at that time, so I couldn't get nobody to go out and tell them to get the records. When I got my new attorney, he got an investigator and they went and got the records.

Q    Why did Carmella go to the motel with you on the night of January 12th?

A    I couldn't tell you. That's a friend of Sandra's. I mean, we was waiting on Linwood, because Linwood, he didn't -- one thing about Linwood, he didn't have people or drug dealers come in his house. He had a son down there and a wife down there. I can say that about him. He wouldn't allow nobody into his house. So we had to wait for him while he finished eating with his family. So Sandra wanted to go see Carmella and I wanted to use the phone. So I went to Amy's house to use the phone. Sandra went upstairs. Now, Linwood and Carmella used to smoke together. They were what you call crack smokers. They smoked together. They used to smoke cocaine together.

Now, the question you asked, I don't know why that

particular day that she came.  I can't tell you.  I don't know.

Q    Do you remember the room number that you stayed in at the motel on the night of January 12th?

A    No.  That was a long time ago.

Q    Do you remember whether it was upstairs or downstairs?  How many floors were in that motel?

A    If I can recall, it was upstairs.  It was upstairs.

Q    Was it the second floor?

A    I'm almost positive of it.

Q    Second floor, third floor?  Do you remember what floor?

A    I don't know whether it was second or third.  I am almost positive that it was upstairs.

Q    You testified a moment ago that you didn't keep guns at your dad's house.  But you did keep guns across the street or in the neighborhood with other people that were holding guns for you, didn't you, Mr. Roane?

A    I kept my gun.  I can't tell you about where the next person kept the other gun.  I kept my gun.  After listening to that tape, I didn't even have a gun.  And after listening to that tape, I went and bought a gun.  Yes, I did.  And I kept that gun on me a lot.  And it was because I felt like at that time, listening to that

tape, I wasn't going to let nobody run up on me and I didn't have a gun.  And I knew they was trying to do something to me.

Q    Didn't Robert Davis keep guns for you on occasion?

A    Robert Davis never kept a gun for me, ever.  Every blue moon I went to Robert Davis's house.  Robert Davis didn't deal with me.  He dealt with Cory Johnson.  He didn't deal with me.

Q    Isn't it true a day or two prior to the Moody murder you went to Robert Davis's house and you retrieved a gun that Robert Davis had there?

A    No, I did not.  I didn't have a gun.  When I got a gun is when I got the tape and listened to the tape. At that particular day when I got the tape, I think it was a day or two later, I think I got the guns -- the guns was purchased on the 14th.  I had no gun prior to that.  If I had a gun, then it wouldn't make no sense going to Southern Gun World and buying guns if I had any.

Q    What time did you check out of the motel on January 13th?

A    I really can't recall a specific time.  I do know that, if I can recall right, the lady called the room and said, I think, "Check-out."  And I asked her to

call a cab.

Q    When you were preparing for your trial originally back in 1993 and Mr. Baugh was representing you, did you discuss with Mr. Baugh whether or not you would testify at the trial?

A    David Baugh at that time told me that he didn't think it best for me to testify.  At that time, sir, I didn't know half the stuff I was charged with.  Nobody never told me about jury selection, that I had a right to be there or I could pick and choose, help pick and choose the jury.  Nobody told me.  I didn't know what CCE means.  I didn't know what racketeering means.  I didn't know what nothing means.  All I knew was, you know, I had all these charges.  That's what I knew. Nobody never really explained anything to me.

Q    Well, you had two attorneys, did you not, Mr. Baugh and --

A    Yes, I did.  And I'm telling you, nobody never took the time to explain to me the facts about, you know, the CCE, murder in furtherance, and things like that, racketeering.  Nobody never took the time.  They said, "Okay, this is what you are charged with."  But nobody ever broke it down to me where I understood it. I don't have a law degree.  I dropped out in ninth grade.  I haven't been to school since 1979.  So I

didn't know anything.  I know better now because I have had years to study, but I didn't know anything then.

Q    Did you have any written communication between you and Mr. Baugh after you had been arrested up until the point that your trial was concluded?

A    You said written?

Q    Did you ever write a letter to Mr. Baugh and say, "David, I want you to do so and so with my trial," or "David, I want you to follow up on this lead"?

A    No.  He would come down to the City Jail, him and Arnold Henderson, and I would tell him things.  He would ask me things and I would tell him things.  And that was basically it.

Q    Did you talk to Sandra Reavis about testifying for you at your trial?

A    At my trial?

Q    Yes.

A    No, I did not.  At that time, you know, I was so mad at a lot of things.  There just was a lot of things happening at that time to me.  And, you know, we wrote each other.  And, you know, I wrote some bad letters to her.  I made threats to her.  I talked junk to her. You know, I mean, she did the same thing to me.  I was writing a couple of girls over at the jail and she found out and she threatened them and ran them to

Case 3:92-cr-00068-DJN    Document 17-5    Filed 07/22/20    Page 61 of 126 PageID# 668

60

different parts of the jail.  Back then I never told her to testify against me.  I only told David and them what happened, expecting them to go and, you know, talk to her lawyer or whatever and subpoena these people.

Q    Well, you did write some threatening letters to Sandra Reavis, didn't you?

A    Of course I did.

Q    Let me show you what's been marked as Government Exhibit 1 and ask you if that's one of the letters you wrote to Ms. Reavis.

(Document proffered to witness.)

A    Yes.  This is my handwriting.  Yes, sir, this is my handwriting.

MR. GRANT:  I move that into evidence as Government Exhibit 1, Your Honor.

THE COURT:  It will be admitted.

MR. GRANT:  Could I have just one moment, Judge?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

That's all I have, Judge.

THE COURT:  Anything else based on that?

MR. ENZINNA:  Very briefly.

REDIRECT EXAMINATION

BY MR. ENZINNA:

Q    Mr. Roane, Government Exhibit 1, the letter you wrote to Ms. Reavis, when did you write that?

A    I know I was in jail when I wrote it, on 17th Street.

Q    Why did you write it?

A    Why did I write it?  At the time, a friend of mine gave -- when Sandra was on bond, I bonded her out when she was charged with the Moody murder in state court. A friend of mine gave her, I think, $600.  And she came down to see me and she was supposedly leaving me $200. She told me she left it.  I went to the quartermaster, which they handle all the money in jail, and they said they didn't get it.  So I called her and she said she did leave it.  And I cussed the people out in the quartermaster's office and they said they never got it.  Shortly after that, Sandra got locked up.  And that's what I was talking about in the letter.  And I was -- because she was writing me from over there asking me to send her cigarettes and stuff like that. And I was pissed off.

Q    You felt that she had --

A    That she had stabbed me in the back.  I felt like that.  I was mad.

            MR. ENZINNA:  Nothing further, Your Honor.

            THE COURT:  Thank you.  You may stand down.

(Witness stood aside.)

Call your next witness.

MR. ENZINNA:  We call David Baugh, Your Honor.

THE COURT:  All right.

DAVID P. BAUGH,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q    Good morning, Mr. Baugh.

A    Good morning.

Q    Would you please state your name for the record?

A    David P. Baugh.  B-A-U-G-H.

Q    And Mr. Baugh, you are an attorney?

A    Yes, I am.

Q    And did there come a point when you were appointed to represent James Roane in this matter?

A    Yes.

Q    Do you recognize James Roane?

A    Yes, I do.

Q    This was in 1992?

A    Yes.

Q    Was this the first federal death penalty case to

Q    which you were appointed?

A    Yes.

Q    The first federal death penalty case you ever handled?

A    Yes.  I think it was the first federal death penalty case we had in Virginia.

Q    That's right.  There were multiple charges against Mr. Roane, correct?

A    Yes.

Q    And multiple murders?

A    Yes.

Q    One of the murders, you recall, was the Douglas Moody murder?

A    Yes.

Q    Mr. Roane received a death sentence for the Douglas Moody murder?

A    That's correct.

Q    That's the only death sentence he received?

A    I believe so.

Q    I want to focus only on the Douglas Moody murder.  When you were appointed to represent Mr. Roane, did you meet with him?

A    Yes.

Q    And did you talk with him about the various charges against him?

A    I did.

Q    Did you discuss the Douglas Moody murder with him?

A    I discussed all the allegations with him.

Q    What did he tell you about the Douglas Moody murder?

MR. BAUGH:  Can I answer that?

THE COURT:  Go ahead.  It is up to you.

MR. BAUGH:  Is there an attorney/client problem?

MR. ENZINNA:  He will waive the attorney/client privilege.

THE WITNESS:  All right.  Mr. Roane was very candid about admitting to me the things that he had done and the things he had not done.  And he told me that he had not been involved in the murder of Douglas Moody.  And I was convinced that he had not been involved in the Douglas Moody murder.

BY MR. ENZINNA:

Q    Did he tell you where he was when Douglas Moody was murdered?

A    Yes.  I remember, this is a long time ago, he told me he had been in a hotel and he told me with whom he had been.  He remembered the name and location.  I drove by and found it.  We talked about it on several

occasions.  And he indicated that another person --
that the room was in the name of another person, and
that it was the hotel down by the Diamond right over
there.  I attempted to find the records and couldn't
find it.  I asked them for it on more than one
occasion.  And I remember going over there and looking
for it on one occasion, trying to find the record under
the belief that the record would corroborate
something.  I also tried to find -- there was another
person who knew about it as well, a woman.  And I tried
to find her as well.  In fact, I vaguely recollect -- I
believe I spoke with the other woman on one occasion,
who was not being cooperative.

Q    Let me sort of untangle that.  James told you he
went to the hotel and spent the night there with
somebody?

A    He told me he spent the night with Sandra.

Q    Sandra Reavis, a co-defendant in this case?

A    Yes.

Q    In addition to Sandra Reavis, there was another
woman?

A    There was another woman who knew about it.

Q    Who knew about it.  What did James tell you about
her?

A    Carmella, whose name escapes me, he told me that

he was going to spend the night with Carmella -- with Sandra, I mean -- that they went over to Mr. Chiles's house, and that they went over to the hotel. Mr. Chiles got the room. He didn't believe it was a credit card. He thought it was a cash transaction. And that Carmella was there or something when they left and knew about it and could alibi him for that period. But I would rather find the document. That's what I was looking for.

Q    You said you did talk to Carmella?

A    I remember vaguely speaking with her, but I know that it wasn't on more than one occasion, and I don't really remember where it was. I do remember she was not cooperative or she wasn't helpful.

Q    She was not? Did she confirm the alibi?

A    Again, I'm going off of my aging memory; she indicated she knew about it, but she couldn't give me a date.

Q    She was not interested in testifying, was she?

A    She was way not interested. I recollect her bordering on hostile.

Q    Did you ever talk with James about subpoenaing her?

A    I don't recollect. I don't know.

Q    Did you ever consider subpoenaing her?

A    No.

Q    Now, the defense you put on at trial to this murder was a different defense, correct?

A    Yes.  During the investigation, if I may, because I had gone over there a couple times to where the event occurred, and I was always under the impression that another person had done the homicide.  And I had heard that Mr. Moody had been chased up an alley about a week before that and who had done it.  I went over there and spoke with some family members about the event.  And I was always under the impression that another person had done the homicide.

While over there walking around one time trying to find out what was going on, I went over, I found a young lady who lived right next to the alley where Douglas Moody was killed, who told me that she had heard the attack and had come out, attempted to render aid, and that she saw the person who had stabbed Mr. Moody, and that it was not James Roane.  And to my regret, I focused on her as a witness because she was a great witness.  She didn't have a criminal record.  She appeared to be disinterested, had nothing to do with the case.  She actually had blood on her hands, I understand, when the ambulance people arrived from her efforts to save Mr. Moody's life.  She said she could

tell me it wasn't James Roane and she told me she didn't know who it was, but she said it wasn't James Roane. So when I had a witness like that, I concentrated on her.

Q    Now, that defense, the misidentification defense that was the put on through Regina Taylor, was not something inconsistent with an alibi, was it?

A    No.

Q    You didn't make a tactical decision to not put on the alibi defense for that reason, did you?

A    No. Upon reflection, I should have used it all, everything I had. There were problems with the document, of course. I knew there were going to be problems with the document because it was in another person's name. And I thought that this witness, an eyeball witness who is not interested in the outcome of the case, was the way to go. I should have kept pressing.

Q    Well, did you ever subpoena the hotel?

A    No. I went over there, and we couldn't find it.

Q    Let me show you what's been marked as a Petitioner's exhibit.

(Document proffered to witness.)

I don't know if you have seen this before. I'll represent to you that these are records obtained from

the Holiday Inn from January 12th and 13th, 1992.

A    This says Howard Johnsons.

Q    It was a Howard Johnsons in 1992.  It was sold.

A    Yes.

Q    Is that something that figured into your efforts here?

A    This is not the name I would have been looking for.  I thought I was looking for Linwood Chiles.

Q    Look on the third page, the last page.

A    Okay.  I never found this one.  This does say Linwood Chiles, 3 January, 1992.

Q    And this is dated 2 January, 1992.  That's not the date of the Moody murder, correct?

A    I don't remember the date of the murder.

Q    Do you see the address there, 1016 West Clay Street?

A    Yes.

Q    That's the same, isn't it, as the address on the second page?

A    Yes, it is.

Q    Now, you did not have this record at the time of the trial, did you?

A    No, I did not.

Q    Had you had this record, would you have done anything differently?

A     Yes.  Yes, I would have.  I mean, it is in another person's name and there are problems associated with that, but if I had this as a starting point, yes, I would have done a lot of things differently.

Q     Did James tell you that Linwood Chiles drove him to the hotel that night?

A     Yes.

Q     Did you talk with Carmella about that?  Do you remember?

A     I don't remember.  I don't know what I talked to Carmella about.  I really don't remember.  I can tell you this:  Based on what limited conversation I had with that young lady, I was convinced that there was at least one occurrence that was in conformity with what Mr. Roane had told me.  But, I mean, there were some problems with it.  But yes, I got the impression that on more than one occasion or at least one occasion, Mr. Roane had gone to that hotel with Sandra Reavis and had spent the night.  And that according to my client, one of those dates was the date of the Moody killing.

Q     Did you ever consider trying to use Sandra Reavis as a witness for the alibi?

A     Yes, I did.  Her attorney was Rob Wagner.  But she was a defendant.  I couldn't use her.  In fact, I discussed using my client as a witness.  And we talked

about his testifying, and he was amenable to it.  I told him the problem, though; that we needed something to confirm what he was saying.  And I really thought without some kind of objective confirmation, that he wasn't going to be believed; and that because of other things he had done, the risk was greater.  So I think it was a tactical decision that we agreed upon not to use him as a witness.  However, it was based upon my inability to find these documents as a starting point.

Q    Did you and James ever discuss whether or not you should subpoena Carmella?

A    I don't remember.  I'm sorry.

Q    Okay.

A    I would have to go on his recollection.

Q    I'd like to show you a videotape and ask you if you have seen this before.

        MR. ENZINNA:  Your Honor, this is Government Exhibit 119 from the trial.

        THE COURT:  All right.

    (Tape played.)

BY MR. ENZINNA:

Q    Do you recognize this?

A    Oh, yes.

Q    It is the --

A    That's Regina Taylor's house.

Q    Where Douglas Moody was killed?

A    In the alley just as you are coming out of the door just to the right.  That unit right there should be parked in front of the alley.

Q    That's the house where Mr. Moody came out?

A    He jumped out of the window there and ran into the alley where he was stabbed.

Q    And that's the alley.

A    In fact, if you go up that alley far enough you will come to where Mr. Moody lived.

Q    Do you see that, Mr. Baugh?

A    Yes.

Q    That's a bloody knife?

A    Yes, it is.

Q    Were you aware that a bloody knife was found in the driveway?

A    I don't remember that.  The reason I was looking at it, it certainly doesn't match the knife that was described that Douglas Moody was stabbed with, which I do remember.  It didn't look like that.  But I don't remember -- I must have seen this, but I don't remember.

Q    Did you ever learn what the police did with that knife?

A    No.  I assume that was the murder weapon, wasn't

it?

Q    I don't know.

A    Oh.

Q    I guess my question is, you never made any sort of tactical decision to not address that knife?

A    No.

Q    Now, the indictment in this case and the case put on by the government involved some evidence of some events that occurred in New Jersey; is that correct?

A    Yes.

Q    A group called the New York Boyz?

A    Yes.

Q    You were aware of that connection?

A    From the indictment, yes.

Q    Did you ever make any effort to investigate the allegations the government was making about those events in New Jersey?

A    No.

Q    Why not?

A    It was always my predicate assumption that that all occurred before Mr. Roane joined the conspiracy and would have no bearing on his guilt or innocence.  He was locked up during the time that was going on.

Q    So you never learned, for example, that certain people who were alleged to be participating in those

events were actually in jail at the time?

A    I did no investigation of it.  I do know that the co-defendants' lawyers did.  But it was always our position, I thought it had nothing to do with my client.

Q    But you never made a tactical decision to not address those events, did you?

A    No.  But I can tell when Mr. Vick did his closing, it wasn't tactical.  It was one of those I goofed up.

Q    Now, since 1992, you have represented a number of other defendants?

A    Yes.

Q    In capital cases, haven't you?

A    Yes.

Q    Federal death penalty cases?

A    Yes.

Q    You have been appointed to represent defendants in some pretty high profile capital cases, haven't you?

A    Yes.  And I will concede there was a learning curve.  I will concede there was a learning curve.

Q    Did you learn anything from this case?

A    Yes.  At the risk of speaking for others, I think we all did.  I remember the arraignment downstairs in Judge Spencer's Court.  And we came in there to set the case.  I remember Judge Spencer said something about

"We can do this in a couple months.  We have all done racketeering cases before."  And all the attorneys about fell over, realized that this is not like every other case.  I think the government did, too.  The voir dire was different.  And in fact, a lot of practices were set by that case which are now a matter of routine in death penalty cases in this district.  I think that some of the things that Judge Spencer wrote about that case have been guidance for other judges in this jurisdiction and others in federal capital cases.

Q    Were there things you did in this case that you now do differently?

A    Yes, many.  Many.  Mitigation -- well, you want me to list them?  There are a lot.

Q    That's okay.

A    There are a lot of things that we do differently. I also believe, and I want to volunteer this, that I think one of the major mistakes I made in that case was, unlike the other death cases that we have done in this district and other districts, we did not coordinate.  Because of multiple defendants, we did not coordinate the penalty phase.  Nowadays, normally when we do the penalty phase of the case, co-defendants' counsel will get together and we will give each other an outline of what our mitigation case is going to be.

In this particular case, we did not do that. So when the mitigation cases were presented one at a time, and I was allowed to see my co-defendants' mitigation cases, because of similarities in experiences of Mr. Johnson and Mr. Tipton and Mr. Roane, they really did get repetitious and sort of unbelievable. And if I had an outline of the experiences the co-defendants had gone through, I would have certainly done something different, particularly since we went first. And I thought there were some very compelling mitigation issues in Mr. Roane's case. Unfortunately, it turned out to be extremely compelling mitigating issues in Mr. Tipton's case and Mr. Johnson's case concerning how they were raised, the nurturing process, what they were subjected to, the sort of records that documented.

I had records when James was six years old asking him to be institutionalized at age six. I thought that would be enough. Then as I sat through the co-defendants' cases, it just sort of got -- it sounded like more of the same. Now when you do a death case, we meet, decide who is going to do what. We still separate them, but we try not to have repetition. We try to have emphasis on your client's mitigation case that another defendant doesn't have.

MR. ENZINNA: May I have a moment?

THE COURT:  Sure.

MR. ENZINNA:  Nothing further.  Thank you, Mr. Baugh.

THE COURT:  All right, Mr. Grant?

CROSS-EXAMINATION

BY MR. GRANT:

Q    Mr. Baugh, with respect to the knife that you saw in the video, there was trial testimony, was there not, from Ms. Taylor, who was your witness, that she brought a knife out to the scene and she used her knife to cut the clothing off Mr. Moody to try to render first-aid?

A    I can tell you, I didn't remember that until I met with Mr. Enzinna to remind me.  I didn't remember her cutting the clothes off him.  We had dinner and he told me about the knife, that knife.

Q    So do you remember it now, that she testified that way?

A    I vaguely remember her and her attempts to render aid taking the clothes off and getting blood on it.  I didn't remember until he told me.

Q    You had interviewed Detective Dalton prior to the trial in 1993, had you not?

A    I don't remember.  I've done many cases with Steve Dalton.

Q    Do you remember whether or not he told you that

the knife that was found at the scene, according to what his investigation revealed, was the knife that Ms. Taylor had used; not the murder weapon, but the knife she used to cut off the clothing of Mr. Moody?

A    I don't have an independent recollection of that, no. I didn't handle the appeal. I have not read the transcript.

Q    You were the discovery coordinator, so to speak, for the defendants in this case, all the defendants, were you not? In that you were given a copy of all of the videotapes that you kept at your office and some of your co-counsel --

A    I would get all the documents, yes.

Q    You shared the documents with other co-counsel that you kept at your office?

A    The total of what I had.

Q    This was one of the tapes?

A    There were several tapes. Yes, there were several tapes.

Q    Let me show you a document. I will just ask you if you recognize that on your letterhead.

        (Document proffered to witness.)

A    Oh, yes.

Q    That's an inventory, is it not, of the videotapes that were provided to you prior to trial?

A     The exhibit is a memorialization of the videotapes that I received, and it is a letter to Ms. Bishop, the paralegal on that case.  And there are 17 items.

          MR. GRANT:  Okay.  I move to introduce that as Government Exhibit 2, Your Honor.

          THE COURT:  All right.  It will be admitted.

BY MR. GRANT:

Q     Mr. Baugh, as of the trial in this matter in 1993, had you participated in any state death penalty cases in state court?

A     Yes.

Q     How many?

A     Three.  One in Texas, two in Virginia.  But one in Virginia never went to trial.  It got dismissed early.  But I do want to point out that it was under the old Virginia death -- well not the old statute, but believe me, there is a tremendous amount of difference between mitigation in a state case and mitigation in a federal case.

Q     Well, in fact, this case, the case involving James Roane, was the first case in the United States to be tried under the federal death penalty statute that had been reenacted some --

A     I don't believe so.  I think Mr. Chandler had gotten tried.

THE COURT: It was the second case.

MR. BAUGH: Thank you. Was it Mr. Chandler?

THE COURT: It was Chandler.

MR. BAUGH: I'm glad to see some of us are still working. Thank you. And I think during our trial there was one in New York that was Mr. Ruhnke with Judge Smith.

THE COURT: That's right.

MR. BAUGH: R-U-H-N-K-E, David Ruhnke.

BY MR. GRANT:

Q    With respect to Carmella Cooley, isn't it true that if she had provided a solid alibi for James Roane in connection with the Doug Moody murder, that you would have subpoenaed her to come to court and testify?

A    If she had provided me with a solid, corroborable alibi, a corroborable alibi, yes, I would have used her. If I thought she wasn't going to gut us or hurt the case in any way, yes, I would have.

Q    So it is entirely possible that she had some reasons why she could not testify; perhaps, for example, she could have said, "I'm not going to testify. I have exposure to what I might say and I'm going to invoke the Fifth Amendment," and you would have been stuck with that; is that not true?

A    I'm not trying to be evasive, but I can tell you, if I could have gotten a solid, corroborable alibi with Ms. Cooley, I would have made a more stringent effort for severance to corroborate her problem with Ms. Reavis.  It would have changed the entire case preparation.  And I know you know this because you and I used to work together several years ago: you start off by formulating your defense hypothesis and then gathering the information that can confirm your defense hypothesis based on what's available.  Periodically, you have to change the hypothesis based on what's available.  Sometimes you hit a dead end; you have to regroup.  I can tell you that if I could have gotten a solid, corroborable alibi out of that lady, that would have changed my entire case hypothesis and presentation, including motions.

Q    Well, tell us specifically what you would have done given that assumption that she would have testified or she -- let me rephrase the question. Assuming that she would have told you that she was with James Roane at the time of the murder and she could provide an alibi for him or she could somehow substantiate his alibi, what specifically would you have done differently?

A    Well, taking that hypothetical -- you are not

going to like this answer -- years and years ago when I was a federal prosecutor in Texas, I got hit with a very creative motion by the defense stating that it was unconstitutional that I could immunize someone as a prosecutor and the defense could not. And they filed a motion requesting permission to have the Court immunize the witness under the due process clause of equal protection. And in my career, I have often thought of pulling that out and trying it in the right case, if for no other reason to argue a sense of sportsmanship; that the defense ought to be afforded the same opportunity, Immunize and make available a witness. Hypothetically, if I had run up against that, I would have tried it. I don't know what I would have done. I don't know what the Judge would have done.

Q    You have no expectation it would have succeeded given the case law in the Fourth Circuit on severance, though, do you?

A    Not on severance. I'm talking about immunity. I'm talking about compelling a witness who has evidence in favor of the defendant, compelling either the government or having the Court immunize that person, even if it is only use-immunity, to enable that person to testify.

Q    Anything else you would have done differently?

A    The severance issue would have been different, yes, I can tell you.  And also my investigation would have been different.

Q    How so?

A    One thing, I wouldn't have relied on Regina Taylor, because there was an aspect to her relationship with Mr. Tipton I didn't know about that came out during the trial which I think negated her credibility.  And if I had an idea that was going to happen or if I had developed the fallback position of corroborating his story, I tell you what I thought I would have done differently: I would have leaned on him more to testify.  Defendants in multiple-defendant death cases, even when they have a viable defense on one homicide, do not want to testify.  And I do remember having this conversation with Mr. Roane.  I said, "If you testify in this one, you are going to have to answer all the questions on the other ones, and you are going to kill Mr. Tipton and Mr. Johnson."

Q    Well, he was going to kill himself on two other murders he was charged with, was he not?

A    No.  The murder out in Southside, I never thought it was drug-related.  I don't remember the victim's name.  That was a guy who was having relations with somebody when he was in prison.  It was a straight

boyfriend-girlfriend lovers' triangle beef and that's what led to that killing. That wasn't a problem. The other ones outside the stabbing, I mean, also I would have cut down on the number of homicides. If I could have cut down on the number of murders he did do, I think that would have impacted on the mitigation case and the penalty phase. I can tell you, Mr. Grant, representing people can be frustrating. But it is particularly frustrating when you know that there is one in there that he didn't do. And that makes it more frustrating.

Q    But Mr. Baugh, you didn't know that at the time, did you? You didn't know that this was a murder that he was innocent of. You know that perhaps now or you think that's the case now, but you didn't know that at the time, did you?

A    If you had asked me to bet money back in 1993 that he didn't do that murder, I would have taken the bet. If you could have put me -- I had no doubt in my mind based on what I knew. I talked to Douglas Moody's mother about the situation where he got run up that alley by Little Keith with the guns and hiding underneath the house all day long and all that, and I had no idea that some of these witnesses came in here and they piled on him. They always do that in a death

case. But no, I had no doubt then and I have no doubt now.

And I tell you, another thing that does it is that on those things that James Roane did do, he told me. We developed a really good and honest relationship. After the case was over he called my office. The things that he inculpated himself on were obviously true, and the one that he exculpated himself on based upon what I could see out there under the circumstances, I had no doubt that he was innocent of that offense, of the Douglas Moody killing.

Q    But the fact is, if he had inculpated himself on two of the murders that he was charged with, it would be a very difficult situation where you would recommend he take the stand and testify "I didn't do this one but I did do the other two"; isn't that a very unlikely scenario to have played out, Mr. Baugh?

A    I don't mean to be flip. That's the only one he got the death penalty on, right?

Q    But he didn't know what he was going to get when he went to trial. He was charged with three counts of capital murder, was he not? So it only took one to make the difference.

A    Yes, you are right. That makes it even doubly frustrating. You are right. I can't say that if he

had testified and inculpated himself in some and exculpated himself on the Douglas Moody killing, that that would have changed the penalty. I can't say that. You are right. This is a natural negative consequence of piling everything into a conspiracy.

Q    Wasn't it part of Mr. Roane's desire that he minimize any collateral damage, so to speak, to Sandra Reavis as part of his defense? Did he tell you "I don't want you to do anything that's going to make it more likely that she will be convicted" because they had had a romantic relationship?

A    Nothing offensive, but Mr. Roane did not want to jeopardize anybody else.

Q    That included Sandra Reavis?

A    That would include Sandra Reavis. I mean, I don't remember speaking -- I do remember speaking specifically about the impact of his testimony on Tipton and Johnson. I don't remember our discussion about Ms. Reavis, though, because she wasn't facing death. I always thought it was a foregone conclusion the most she could get was life if she was going to get it. They had enough drugs to make out the Guidelines.

MR. GRANT:  May I have just a moment, Your Honor?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

MR. GRANT:  That's all the government has for this witness.

THE COURT:  All right.  Any redirect?

REDIRECT EXAMINATION

BY MR. ENZINNA:

Q     Just a couple of questions.  Mr. Baugh, you have in front of you Petitioner's Exhibit 3, the records of the hotel.

A     Yes, I do.

Q     During cross you were talking about a corroborable alibi.  Would that record have provided you with a corroborable alibi?

A     This is the first time I've seen this.  And when I did see it, believe me, I went through a thought process.  There are problems with this.  And there are problems with corroboration of this; namely, that it is in another person's name.  But --

Q     Linwood Chiles was dead at the time, correct?

A     Yes, he was.  And Sandra Reavis, the other person in the hotel room, was a co-defendant and can't testify.  And there was also a problem with whether or not, and I don't remember if Carmella Cooley remembered the date.  But I can tell you that if I could have gotten this in -- of course I could have because it is

a business record -- there were corroboration problems with this. But the fact that -- I mean maybe we could put him there on the date, I don't know. But the fact that there are only two of these records and one of them matches the day of the Douglas Moody killing, statistically the likelihood of his being able to make this up is extremely remote. I mean, how would he know that he was in a hotel on a date that I am sure he doesn't remember the date of that killing, and I know he didn't remember the exact date of the hotel room. Which it turned out to be the exact date.

But the fact that he could have divined this, made this up, would be extremely remote. The fact that there are only two of these documents in existence and one of them matches the date of the Douglas Moody killing, I think that gives me a good starting point to determine some form of corroboration.

MR. ENZINNA: Nothing further.

THE COURT: All right. Thank you. You may stand down.

Do you all have anything else?

MR. ENZINNA: Yes, sir, we do. We have three more witnesses.

THE COURT: We are going to take about a ten-minute break.

(Recess taken from 11:10 a.m. to 11:17 a.m.)

THE COURT:  All right, call your next witness.

MR. ENZINNA:  Your Honor, we call Demetrius Rowe.

DEMETRIUS ROWE,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q    Ms. Rowe, would you please state your name for the record?

A    Demetrius Lavonne Rowe.

Q    Where do you live?

A    508 North 33rd Street.

Q    In Richmond?

A    Richmond, Virginia.

Q    How old are you?

A    34.

Q    I want to take you back to January of 1992, roughly ten years ago.  Did you witness a murder at the corner of Clay and Harrison Streets in January of 1992?

A    Yes, I did.

Q    Who was murdered?

A    Douglas Moody.

Q    I'd like to show you what is Government Exhibit 17-1 from the trial of this case.

(Document proffered to witness.)

MR. ENZINNA:    May I approach the witness?

THE COURT:    Go ahead.

BY MR. ENZINNA:

Q    This is an aerial photograph.  You will see that the streets are labeled here, Clay Street, Catherine Street, Harrison Street.

A    Yes.

Q    Can you show me on that photograph and show the Court where you were that night?

A    That night I was standing on Harrison Street.  I was standing -- this is some type of Virginia Power plant.  I was standing on the porch across the street from where Doug -- by the alley where Doug was murdered.

Q    So basically there is a white house next to that alley, correct?

A    Yes.

Q    And were you directly across the street from the white house?

A    Yes, standing right on the porch.

Q    Okay, thank you.  And when were you standing there?

A    Let me see.  Well, I can't exactly give you the exact time, but I know it was between the hours of eight to like 9:30, then I left and came back, and it was around about ten to after.

Q    What were you doing there?

A    Well, a friend of mine, we were drinking.  And we just happened to leave where we were at to go drink alone, and we just walked, used to walk around.  So the porch we sat in because no one lived there.

Q    The house was empty?

A    Yes, it was vacant at the time.

Q    And tell me what you saw in the house across the street.

A    Well, like I said, I had been drinking and --

Q    How much had you been drinking?

A    Well, through the course of the day I had been drinking for like several hours before, drinking like pints of gin or whatever.  I was kind of high, but I was still -- my vision, I still was able to see what I witnessed.

Q    What did you see?

A    Me and Charles, we was sitting on the porch and I heard at the house where Doug had came out, I heard

something that sounded like somebody was fighting inside. They were loud, like hollering. So I stood up. I said, "What's going on over there?" So the next thing I know, Doug and -- Doug is coming out the door. It is like he is struggling. It is like whoever he is in the house with, they are fighting and he is trying to get out. So I see Doug come out and I see a guy like on him, but they are still struggling. So at that time --

Q    Where were they struggling?

A    They was outside the gate then. They was -- they were struggling coming out.

Q    Coming out of the house?

A    Coming out of the house. And at that time I got up. I'm like "Let me go there," because I could see at that time that Doug had really been messed up. At that time, I don't know exactly what happened or whatever, but I know that I could hear in the house it was like they were fighting. They was loud, like something had broke or something. They were struggling and -- he was struggling trying to get out the door.

Q    How many people did you see come out of the house?

A    Okay, at that time I saw Curt, Pepsi, and I saw, the guy that was on him, like I told you, I knew it

wasn't James.

Q    You knew James Roane?

A    Yes, sir.  I knew it wasn't James because of his skin.  James is about like I am.

Q    And this person was what?

A    He was light-skinned.  So the guy that was kind of struggling with him, I figured it was over because it wasn't James because I knew James's figure.  Because they always wore hoods.  And I knew James because James, well, like now he is bigger.  But back then "O" was always thicker.  So I told Charles, I said, "I'm gone.  That looks like "O" over there.  What they doing with him?"  At the time they said that Doug had been shot.  This is what I heard, that he had been shot or whatever.  I said, "I didn't hear no gunshots."  If he had, I didn't hear it.  But I know earlier that day I saw who was going in and out of the house.  And although I wasn't sitting on the porch the whole time, from where I was standing on the corner I could see because it was a drug house.  People were going in and out.  And James never went over there.

Q    That's what I wanted to ask you.  You said you knew James Roane.  Had you seen him at all that evening?

A    The first time I saw James was on -- I saw Sandra

Reavis. And I said, "Sandra, could you come here for a moment?" Because I wanted to ask her could I borrow some money. She said, "Hold on, wait a minute." She said, "I'm getting ready to go out, we be getting ready to go out to the buffet and eat. You got to come with us, girl, because they have got some good food at Golden Corral." I said, "What?" "Me and James." I said, "You old enough to be James's mama. What you going out with him for?" She said they was going to the hotel. She walked down by the store. Now I'm standing on Catherine and Harrison Street. So I waited for her to come back. But when I see her come back with James, I forgot about asking for the money. That's the first time I saw James at that time.

Q    What time was that?

A    This had to have been, I don't know, like I say, at this time it was 8:30.

Q    Did you see James and Sandra leave the area?

A    Yes, I did.

Q    Now, when you saw the murder occur, you saw this struggle in the alley across the street, did you see a woman come out of the house across the street?

A    A woman?

Q    A woman.

A    Okay, as the struggle, as they came out, Pepsi,

like I told you before, Pepsi and Curt came out.  I saw them two come out.  Yes, I saw a woman come out.  It was Pepsi.

Q    Did you see a woman come out and try to help Doug Moody?

A    Oh, yes, I did.  By that time, like I said, I walked down because the way the commotion was, I knew that the police and the ambulance was coming.  So I didn't want to be around because I had been drinking and I had liquor in my hand.  So the girl, Gina, the alley is right here, and this where Doug came out.  Her house is right here.  I saw her come out.  She came out.  And the way her porch is, you can stand -- there is no railing or nothing, so she was standing like this looking.  And she said, "Hmm, that's a damn shame.  They got the man selling drugs, they going to kill him."  I heard her say that.  Because she was like kind of nervous and she was like scared because it was going on on the side of her house, the way she had came out.  So after that I just went on.

Q    Were you ever interviewed by the police about the murder?

A    No.

Q    Were you ever interviewed by a lawyer for James other than myself?

A    What you mean, recently, or ten years ago?

Q    I mean ten years ago.

A    No.

MR. ENZINNA:  Your Honor, nothing further.

THE COURT:  All right.  Cross?

CROSS-EXAMINATION

BY MR. GRANT:

Q    Ms. Rowe, how many people did you see come out of the house when Doug Moody came out of the house in some distressed condition?

A    I saw Doug and Pepsi and -- Doug, Pepsi, "O," Whitey, and there was another fellow.

Q    And you couldn't --

A    So that's five people.

Q    You could not identify who the last person was, the third man; is that what you are saying?

A    The third man?

Q    Right.

A    No, I can't identify.  But I know it wasn't James because of the way that he was built.  I knew it wasn't James.

Q    Well --

A    Because like I say, when Doug came out, it was "O" that was on him, that was struggling with him.  Whitey had came out.  I knew that -- because they always wore

hoods. The third guy didn't have -- he didn't have a hood on, but he had on, you know, like a sweatshirt or whatever. But Pepsi, Curt, and this fellow, and Whitey, they all came out. But at the time, "O" was still struggling with Doug. I guess they was coming out of the house. They already knew that the police was coming.

Q    When did you leave the scene? What was happening at the time that you left? Was Doug Moody already on the ground?

A    What was happening? Yes. As I was walking, I was standing walking and looking like this down the street real slow, and I see Doug on the side. I see the guy that's on him, it was "O", after Doug is on the ground. He just get up and walked away. Evidently, Gina had to have been standing at -- peeping out of her window or peeping out of the door, because as soon as he walked away from Doug, she opened her door and came out.

Q    Did she have anything in her hand when she came out, Ms. Taylor?

A    Oh, I can't remember.

Q    Did you see a knife that she may have used?

A    In her hand?

Q    Yes, ma'am. That she may have tried to use to cut the clothes off of Doug Moody?

A     Oh, no.  I don't remember that.

Q     Do you remember seeing that?

A     Seeing her cut the clothes?

Q     Yes, ma'am.

A     No.  But I remember when she was standing on the porch, I know that I found out later what I know now, that she does some type of nursing.  And she did come off her porch.  But whether she cut -- took a knife and cut his shirt, I don't know.

Q     Did you see Denise Berkeley in the area the night Doug Moody was killed?

A     Denise?

Q     Do you know Denise Berkeley?

A     No, I didn't see her.

Q     Do you know who she is, though?

A     Yes.

Q     But you did see Pepsi Greene come out of the house after Moody came out struggling with three other people?

A     Yes, sir.

Q     Do you remember talking to me and Detective Leonard over at your house back on May 5th, a little over a month ago?

A     Yes, I do.

Q     Do you remember telling us that you didn't know

who the third person was, and that it could have been James Roane but you just did not know who the third person was that came out of the house with Doug Moody?

A    You asked me at the house, you said -- these were your exact words -- you said, "Okay, you say that the third person wasn't James Roane." I said, "No, it wasn't James. I saw James leave." You said, "Well, is there any possible way that James could have backtracked?" I said, "Well, if he did, I didn't see him." But I told you the third person was not James. That's what I told you.

Q    You said to me that --

A    I said, "It is possible." No, you said, "Is it possible that James could have backtracked without you knowing?" And I told you that it is possible because anybody can leave and come back. But I never said -- yes, I said, after you kept asking me, I said, "Yeah, he could have backtracked," but I never said that it could have been James.

Q    Well, didn't you tell me and Detective Leonard that the reason you said in your affidavit that we showed you, the reason you said why James Roane was not there at the time was because you had seen him leave earlier in the evening and that was what you based that conclusion on; isn't that correct?

A    Yes.

Q    And then I asked you, "Well, if you said the reason for your belief that he was not there around midnight was that you had seen him leave earlier, isn't it possible that he could have come back in that three or four-hour period?"  Isn't that what I asked you?

A    Yes.

Q    And you said, "Yes, it is possible he could have come back."

A    Yes.  I said that was possible after you kept saying -- I said, "I don't know if they came back or not."  You said, "Well, I'll asking you again:  Is it possible, was it possible that James just could have left and came back without you knowing?"  I kept telling you "I don't know if they came back or not.  And yes, it is possible."  I said, "If they did -- if he did come back he is a good one because he would have had to come in the side door because there is only one way in and one way out."

Q    But you did leave the area, you just testified, for some period of time.  You were not in sight of the house that Moody was attacked in for how long, an hour or two?

A    Well, I was in sight because there is a nip joint right here, and there is one right at the alley.  But

the time that I went to the nip joint that was on Catherine Street was like right after I saw James and Sandra, you know, leave.

Q    And you were gone for some period of time.  You were inside the nip joint for some period of time; is that correct?

A    Maybe 15 minutes.

Q    Do you know an individual named Keith Barley or Little Keith?

A    Yes.

Q    Did you see Little Keith Barley in the area on the night that Doug Moody was killed?

A    No, I didn't see Keith.

Q    How long had you known Little Keith Barley?

A    Ever since he was three years of age, which would have been maybe about like 17 years.

Q    Did you know Douglas Moody before he died?

A    Yes, I knew Doug.

Q    Do you know whether Doug Moody was selling drugs, crack cocaine?

A    Now, like I told you, I did not know that Doug was affiliated with Whitey and "O" and James and the other people, but I knew that Doug was a heavy drug user.

        MR. GRANT:  May I have just a moment, Your Honor?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

MR. GRANT:  That's all we have of this witness, Your Honor.

THE COURT:  All right.  Any redirect?

MR. ENZINNA:  No, sir.

THE COURT:  All right.  I have a couple questions.

BY THE COURT:

Q    Ms. Rowe, you say Mr. Roane and Ms. Reavis left; you saw them leave the area.  How was that?  Were they in a car, walking?

A    Like I said, it has been ten years ago.  If I am not mistaken, like I said, a cab had came and I saw James and Sandra get in the cab.

Q    All right.

THE COURT:  Anything based on that?

MR. ENZINNA:  Your Honor?

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. ENZINNA:

Q    Ms. Rowe, had you ever seen Mr. Roane and Ms. Reavis ride in a cab on other nights besides that night?

A    Yes.  That was a routine for them.  Basically,

every weekend, twice a week. Because Sandra lived -- the apartment that I was staying at, she lived in the second duplex down. She would call a cab and James would come meet her. Yes, I've seen them leave several times.

Q    So they rode in cabs pretty often?

A    Yes.

Q    Not always?

A    Yes, every time I saw them leave, when I saw them leave I have seen them leave in a cab, like three or four times.

Q    Did you ever see them walking around the neighborhood?

A    Yes.

Q    Did you ever see them riding in another car?

A    Several cars. I have seen them ride in a guy named, this is a nickname, a guy named Dick's car, Linwood. He dead now.

Q    Is Linwood Linwood Chiles?

A    Yes. That was his name. Linwood. And there was another guy, but -- Talley. They used to ride with him.

MR. ENZINNA:  Nothing further, Your Honor.

THE COURT:  All right. Anything based on that?

MR. GRANT: No, sir.

THE COURT: Thank you, ma'am. You may stand down.

(Witness stood aside.)

Call your next witness, please.

MR. ENZINNA: We call Detective Dalton, please.

STEVE A. DALTON,

called as a witness by and on behalf of the Petitioner, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ENZINNA:

Q    Good morning.

A    Good morning.

Q    Would you please state your name for the record?

A    Steve A. Dalton.

Q    And in 1992, were you employed by the Richmond Police Department?

A    Yes, sir, I was.

Q    What was your position then?

A    In 1992 I worked two different divisions that I know of. I was on what was called the Midnight Cruiser, and at some point I was transferred over to the Homicide Unit.

Q    You were a detective?

A    Yes, sir, a detective.

Q    Were you the investigating officer on the murder of Douglas Moody?

A    That's correct.

Q    I'd like to hand you what's been marked as Petitioner's Exhibit 4.

(Document proffered to witness.)

If you would just take a look at that and tell me if you recognize it.

A    Yes, sir.  It is a supplementary report that was done with the offense report for the murder.

Q    Were you assigned to the investigation of the murder on January 13th, 1992?

A    Yes, sir, I was.

Q    The murder occurred early that morning, didn't it?

A    That's correct.

Q    Now, this document is, correct me if I am wrong, but it appears to be a roughly chronological record of the investigation; is that correct?

A    That's correct.

Q    Basically tells what happened and then what happened next and what happened next?

A    That's correct.

Q    Now, if you look at the last paragraph on the first page -- let me back up.  Look at the second paragraph on the first page.  It talks about a woman that came out of the house named Ms. Taylor.  Who went outside to give aid to the victim?

A    You are talking about which begins on January 13th, 1992?

Q    Yes.

A    At approximately 005 hours, yes, that's correct.

Q    Regina Taylor heard a noise outside her home?

A    That's correct.

Q    So Ms. Taylor was an eyewitness to the murder, correct?

A    From this report, the statement I took from her, she looked out the window and observed a black male standing over top of another black male stabbing him in the back.

Q    At that point in time on January 13th at five minutes after 12, Gina Taylor was your most important witness to the crime, wasn't she?

A    At that point, yes.

Q    Did there come a time when someone else became the most important witness in the investigation?

A    Yes, that's correct.

Q    Who was that?

A      I recall Pepsi.

Q      Pepsi Greene?

A      That's correct.

Q      And if you look on the second page.

A      Yes, okay, down at the bottom.  Priscilla Greene.

Q      It starts talking about Priscilla J. Greene?

A      Yes.

Q      Priscilla Greene is mentioned on January 28th, 1992?

A      That's correct.

Q      So basically, she comes into the picture about two weeks after the murder, correct?

A      That's correct.

Q      Now, back to the first page, at the bottom paragraph, it talks about Catherine Wallington.

A      That's correct.

Q      Catherine Wallington was Douglas Moody's mother, correct?

A      Yes.

Q      She told you that approximately an hour before the murder, Keith came by looking for her son?

A      That's correct.

Q      And that her son -- Keith dealt drugs for Maurice, and her son stated that they were looking for him?  Do you see that?

A       That's correct.

Q       So after you talked to Catherine Wallington, was Keith a suspect in the murder?

A       At that point he was, yes, sir.

Q       Between that date, January 13th, 1992, and January 28th of 1992 when you talked to Pepsi Greene, did you ever go back to Gina Taylor and ask her about Keith?

A       I don't have anything in this report stating that I did.  And I don't recall.

Q       Well, if you had, would it normally be listed in this report?

A       Not necessarily.  It might have been in my private notes, but I don't believe -- I would assume that I would have.  But like I said, I'm not seeing it in this report stating that I went back at any time.

Q       Is there a reason why you wouldn't ask Gina Taylor about Keith after you learned about Keith?

A       No, there wouldn't be.

Q       Now, you talked to Pepsi Greene on the 28th, correct?

A       That's correct.

Q       She indicated James Roane committed the murder?

A       That's correct.

Q       After that point, did you ever go back to Gina Taylor and ask her about James Roane?

A    If I can refer back to my notes, I could.

Q    Do you have those with you?

A    Yes.

Q    Please do.

A    These would have been the notes that you would have looked at the other day.  Starts at the top "Kareem A. Hakim, a/k/a Douglas Moody."  There is no mention in my notes of ever doing a second interview with Gina Taylor.

Q    Are you aware that Gina Taylor has testified that the man who committed this murder was not James Roane?

A    No.

Q    Let me hand you what I would like to have marked as Petitioner's Exhibit 5.

    (Document proffered to witness.)

    Tell me if you have seen that before.

A    Yes, sir, I have.

Q    What is it?

A    That's a property and evidence voucher dated January 13th, 1992 prepared by Detective Paul C. Tuttle.

Q    And it says 800 block North Harrison Street?

A    That's correct.

Q    So does this list all the physical evidence that was recovered at the scene of the murder?

A    It should, yes, sir.

Q    Let me show you a brief section of a videotape.

(Tape played.)

MR. ENZINNA:  Your Honor, this is Exhibit 119 from the trial.

BY MR. ENZINNA:

Q    Detective Dalton, do you recognize this?

A    Can I have permission to step a little closer? Age is catching up with me.

THE COURT:  Go ahead.

(Witness approached monitor.)

BY MR. ENZINNA:

Q    I can rewind it a little bit.

A    From the date and time, it appears to be the 800 block of North Harrison Street.  I'm going on the date and time and the street itself.

Q    Do you recognize the scene of the Douglas Moody murder?

A    That would be consistent with it.

Q    The house and the alley right here?

A    Yes.  As a matter of fact, this would be the house right here.

Q    Now, this is a videotape of the scene as it looked immediately after the murder?

A    That's correct.

Q    Do you see this?

A    Yes, sir.  Butcher knife.

Q    A bloody knife?

A    Butcher knife.

Q    But is there blood on it?

A    Yes, sir.

Q    Thank you.  Now, go back and take a look at Exhibit 5 again if you would, please.

A    Okay.

Q    There is no indication on this document that that knife was recovered at the scene, is there?

A    No, sir, there is not.

Q    Do you know why that is?

A    Detective Tuttle was a forensic detective.  But the only reason that I would have for it is in Ms. Gina Taylor's statement to me, she had used a butcher knife to cut off the victim's clothes and to assist him until the ambulance arrived.

Q    And did you all assume that that was the night that she was talking about?

A    If we went back to her, like I said, I don't recall how she would have gotten the knife back other than us releasing it back to her as far as identifying it as her knife and releasing it back to her.  That would have been the only way it would have been

released at that time.  Like I said, I don't recall from memory the circumstances of it.

Q   Here is my question:  Here you have the scene of a stabbing murder, correct?

A   I believe initially it appeared to be a shooting murder.

Q   There was stabbing involved, wasn't there?

A   That's correct.

Q   And there is a bloody knife on the scene.

A   That's correct.

Q   Do you have any record in your notes of this knife ever being tested by the police, fingerprinted?

A   No, I don't have any records of it, no.

Q   Is that standard procedure?

A   What do you mean by standard procedure?

Q   It would seem to me that where you have a -- it would seem to me that where you have a stabbing murder and a bloody knife is found on the scene, I would think it would be standard procedure to collect that knife and test it.  Wasn't it?

A   Unless there was, you know, a witness stating that that was their knife and it was consistent with what they were saying.  Like I say, that would be the only reason that this knife would not be on here.  I'm not putting the blame on Detective Tuttle.  Detective

Tuttle was a forensic detective.  I was the investigator.  Like I say, I don't know any other reason for the knife not being there except Gina Taylor identifying it as the knife that she used to cut off the bloody clothes.

Q   As far as you know, that knife was never fingerprinted?

A   As far as I know.

MR. ENZINNA:  Nothing further, Your Honor.

CROSS-EXAMINATION

BY MR. GRANT:

Q   Did you interview Keith Barley after he became a suspect in this case initially?

A   Yes, sir, I did.

Q   What did he tell you?

A   He admitted that he had been looking for the victim that night, and couldn't find him; that he had heard on the street that the reason he was killed was because of a tape recording that the unknown suspects had.

Q   I assume he denied any participation?

A   Yes.

Q   In that.

A   Yes.

Q   When you saw the house from which Doug Moody came,

did you observe any broken glass at the scene?

A    Yes, sir.    From my report, I had that the glass was broken from the inside out.

Q    Were there slats in the window that were broken as well as glass?

A    I would have to see photos because I could not remember back.

Q    Did any of the witnesses that you interviewed tell you that Doug Moody actually came through a window as opposed to the door to the house?

A    I believe that that's the way Pepsi described it in her statement.  I'm sorry, Priscilla Greene described it in her statement to me.

MR. GRANT:  That's all I have, Judge.

THE COURT:  Anything else?

MR. ENZINNA:  No, sir.

THE COURT:  Thank you.  You may stand down, sir.

(Witness stood aside.)

Call your next witness.

MR. ENZINNA:  Your Honor, we have nothing further.

THE COURT:  All right.  Okay.  Mr. Grant, do you have anything you want to put on?

MR. GRANT:  I might have two brief witnesses

if I could have a five-minute recess to check on their status.

THE COURT: Sure. We will take five minutes.

(Recess taken from 11:50 a.m. 12 o'clock p.m.)

THE COURT: All right. Mr. Grant?

MR. GRANT: The government will not have any evidence to present. We rest.

THE COURT: All right. I'll hear brief argument if anybody wants to say anything else. Do you have anything you would like to say?

MR. ENZINNA: What I would like to ask is, I had thought of proposing that we submit some kind of written and proposed findings or brief taking this new evidence that we have today and synthesizing it along with the other evidence we do have.

THE COURT: I do that sometimes, but I don't need it under these circumstances.

MR. ENZINNA: Then Your Honor, we are here today on two separate issues. One is Mr. Roane's actual innocence in the Douglas Moody murder and one is ineffective assistance of counsel in connection with that murder.

Let me take Mr. Roane's innocence first. The Moody murder, the evidence of the Moody murder

consisted of first of all Gina Taylor, who we know saw the murder, who was the critical witness at the time of the murder because she saw it.  She testified at trial that James Roane didn't commit the murder.  We also have Pepsi Greene and Denise Berkeley.  Pepsi Greene and Denise Berkeley are two witnesses who were, A, using drugs the night of the murder; B, making deals with the government; and C, frankly, particularly in regard to Pepsi Greene, her testimony with regard to what happened that night is wildly inconsistent and flatly internally inconsistent.  She talks, for example, in her police interview, when she interviewed with the police about how James Roane was outside the house and then ran back in to stab Mr. Moody, while at trial she testified that James Roane came out of the house with Mr. Moody.

Her knife -- she talks about Mr. Roane coming into the house and getting the knife from her in order to use that to stab Mr. Moody.  When she first met with the police in January of 1992 she didn't mention a word about that knife.  She said James Roane already had the knife.  Couple all that with the fact that the police found a bloody knife at the scene but didn't bother to pick it up, didn't bother to test it, didn't bother to fingerprint it.

What you have here is a situation where you have basically a question of who committed this murder. You have a couple of eyewitnesses who saw it. We have several eyewitnesses who are high on drugs, making deals with the government. We have one eyewitness who has neither of those things. That eyewitness says James Roane didn't do it. Mr. Roane got up here and testified today. James Roane told you he didn't commit that murder. He said there were things here that he was charged with and convicted of in this case that he did do, and that he feels sorry for, but this is one he did not do.

Let me address ineffective assistance for a moment, if I may. We heard James Roane and David Baugh both get up here and testify today that at the time James was charged with this murder, he told David in no uncertain terms, "Look, David, I am charged with X, Y, and Z. I did X. I did Y. I did not do Z. In fact, at the time of the Moody murder, here is where I was. I was at this motel. I was with Sandra Reavis. I was with Carmella. I was with Linwood Chiles. And you, David, should go out and find that stuff and put on that alibi evidence."

So what happens is, Mr. Baugh goes out, goes to the hotel and says, "Do you have the records?" or at

least he says he did. He went to the hotel, wasn't able to get the records very quickly, and basically gave up on getting the records. He went to talk to Carmella. She was a little iffy about it, told him she didn't want to get involved. Basically, he just punted on the alibi for no tactical reason. Because as he said, there is no inconsistency between the alibi defense and the defense that he did present at trial, which was the misidentification. He just basically blew it off.

We went to the hotel to get those records. They said, "Come on in. Here are the records. Have at them." Mr. Brown got up and testified that he went there, they opened up the boxes, they were arranged in date order. He went through and very easily found these records, found the record of Linwood Chiles getting a room that night at the hotel, just like James had said. Mr. Baugh saw that record. He said this would have changed everything, "completely changed my case. It would have changed my investigation, my theory of the case. I would have found a way to get Carmella in there." James was telling Mr. Baugh at trial, "Subpoena Carmella." "She doesn't want to come in." "Subpoena her. She has to come in because she is the only person that can get up there and testify and

put me at that hotel, which is where I was." And he didn't do it. He just didn't do it. He testified there was no tactical reason for doing that. It wasn't that he decided, "Well, gee, that defense is going to be inconsistent with this other defense. I'm going to go with that one." He just said, "Heck with it, I'm going to let it drop."

And this is a critical -- I mean, I have a tremendous amount of respect for Mr. Baugh as a lawyer. But this is a critical failing. Because as it turned out, Mr. Roane received a death sentence for one murder, one murder, the Douglas Moody murder, and that is a murder that he did not commit.

I think that's all I have, Your Honor.

THE COURT: All right. Mr. Grant?

MR. GRANT: Just briefly, Judge. I think the testimony you heard today was more inconsistent than the trial testimony. You heard Ms. Reavis testify that Carmella went into the hotel and that Linwood stayed in the car. Again, Mr. Roane tells a different story. Mr. Roane testified he had been to that motel many times. Yet his investigator who searched the records found but two documents to support that theory. Mr. Baugh testified that he made a diligent effort to find those records and he couldn't find them.

That's not ineffective assistance of counsel if he did everything he could have done. There are multiple other hypotheses as to why he may not have found them. But the fact is, he is not to be blamed because he searched and the records didn't appear.

I think the critical thing on the ineffective assistance claim was Mr. Baugh's acknowledgement to me that given the posture of this case and what Mr. Roane was charged with and what Ms. Reavis was charged with, there was no way that Mr. Baugh would have failed to have called an alibi witness had he had an alibi witness, that he could have called if one in fact existed based on what he knew at the time. The only two options were to call Sandra Reavis, and that was not an option because as the Court knows from the appeal, Mr. Roane could not compel Sandra Reavis to testify. She was a co-defendant in this case. She had a Fifth Amendment privilege. And she certainly didn't have to testify for him. So procedurally, he was stuck with that. There was nothing he could have done to get Ms. Reavis's testimony before the Court.

And Mr. Baugh admitted on the stand that as to Carmella Cooley, had he had a solid alibi witness, he would have called her to testify. Now, there are a lot of explanations that come to my mind as to why he

didn't call her. Number one, she may have told him, "I'm not going to testify. I have exposure. I'm going to assert the Fifth Amendment. Therefore, I'm not going to testify so don't waste your time." She may have said something that was incriminating about Mr. Roane that was determined to be more serious, more detrimental than anything she might have said that could possibly have exonerated him. Because as Mr. Baugh acknowledged, her name is not on any document. Mr. Roane's name is not on the document. It is Linwood Chiles's name that's on the document. And therefore that document, even if it existed, would not have been that useful to him.

So I think we heard a candid admission from David Baugh, as much as he wants to help his client out at this time, that there really -- it would not have made any difference because we heard him say if Ms. Cooley, who he had obviously interviewed, had told him that she could have provided an alibi, he would have called her to testify. Therefore, there must be some explanation that he cannot recall at this time as to why he didn't do it. So the Court has to assume it was a tactical or a practical decision that prevented him from calling her as a witness.

And I think given the significant evidence of

other eyewitnesses who testified at trial, there is nothing to offer today that would suggest that Mr. Roane, number one, is actually innocent; or number two, that his counsel was ineffective by the very high standard that the Supreme Court requires to make a finding of ineffective assistance of counsel.

THE COURT: All right.

MR. ENZINNA: If I may, a couple of points. First of all, Mr. Grant talked about James Roane testifying that he had been to the hotel many times but that he says his investigator only found two records. Your Honor, that's just not accurate, first of all, because I know what the investigator found. He found many of the records involving other names of people that we thought might have been relevant. But the record for January 12th and 13th of 1992 in the name of Linwood Chiles was obviously of critical relevance here.

Mr. Grant also said that David Baugh made a diligent effort, did everything he could have done to get the records. Well, he didn't. And we know that's true because we got the records. We got them quite easily, frankly. He may have been -- we don't know what happened. He just said he doesn't remember what happened. But he also did not subpoena the hotel for

the records.  So he didn't do everything he could have to get the record.

Then Mr. Grant said that David -- I'm sorry, Mr. Baugh -- testified that there was no way he would have failed to call an alibi witness, the word he used was "a corroborable alibi witness," had he had one.  The fact of the matter is, he did not call Carmella.  Mr. Grant says, "Well, we have to just assume that he had a good reason for doing that."  With all due respect, what we are talking about here is we are talking about someone's life.  And we are trying to basically make something up about why Mr. Baugh did not call Carmella.  There is simply no evidence at all that David Baugh made a tactical decision not to call Carmella.

Mr. Grant talks about a significant amount of speculation that perhaps Carmella may have had some exposure.  She may have said, "Look, I'm going to take the Fifth Amendment," or she may have had something incriminating to say about James Roane.  Frankly, there is just no evidence of that.  And we have tried to locate Carmella and bring her here.  We just have not been able to do that.  Frankly, she was out there for the government to locate, too.  If they wanted to bring her in to say, "I talked to David Baugh and told him I

wasn't going to testify because I was going to sink James Roane," they could have done that.

The bottom line, Your Honor, I can sum it all up with what Mr. Grant said when he said David Baugh indicated that these records and this information would not have made any difference: Obviously, David Baugh testified. And what I heard him say was, "Had I had these records it would have changed my case. It would have changed everything about this case." This is what he said. He said Carmella indicated she didn't want to testify. Frankly, nine times out of ten witnesses don't want to testify. But she was fuzzy on the dates. You know, one way to clear up fuzziness about the dates is to show her a record and say, "Does that refresh your recollection?" Had he simply gotten the records, he might have turned her into a witness that would have really turned this case around. Thank you, Your Honor.

THE COURT: All right. I'll take the matter under advisement. And don't expect anything in short order. I'm going to get the transcript to this so we can cite to the record and I'll get it to you when I can. All right, thank you very much.

MR. ENZINNA: Your Honor, may I raise a couple of critical issues?

THE COURT: Sure.

MR. ENZINNA: I just wanted to alert you that one of the things we did in connection with this hearing was we issued a subpoena to MCV for some medical records, and they filed a motion to quash. I'm going to withdraw that subpoena.

THE COURT: All right.

MR. ENZINNA: I also want to ask, Your Honor, if it would be permissible for Mr. Roane to have a moment or two to visit with his family. His children are here in the courtroom.

THE COURT: Talk to the Marshals. I don't have anything to do with that.

(Proceedings adjourned at 12:17 a.m.)

CERTIFICATE OF REPORTER

I, Jeffrey B. Kull, CP, RPR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

JEFFREY B. KULL, CP, RPR

_____

DATE